Barbara **WALTON**, individually and as next friend of Courtney Walton and Kamara Walton, Plaintiffs–Appellees,

v.

**CITY OF SOUTHFIELD**, Keith Birberick,* Robert Castleman, Defendants–Appellants.

Nos. 91–2049, 91–2083 and 91–2115.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1992.

Decided June 10, 1993.

---

* Defendant Birberick's name also appears in the record spelled as Berberick.

Dolores Preston–Cooper, Patrick, Fields & Preston–Cooper, Detroit, MI (argued and briefed), for Barbara Walton.

Yvonne M. Jennings, Patrick, Fields & Preston–Cooper, Detroit, MI (argued), for Courtney Walton.

Lawrence C. Patrick, Jr., Patrick, Fields & Preston–Cooper, Detroit, MI, for Kamara Walton.

Marcia L. Howe (argued and briefed), Cummings, McClorey, Davis & Acho, Livonia, MI, Susan P. Ward, Southfield, MI, for City of Southfield, Keith Birberick, Officer, and Robert Castleman, Officer.

T. Joseph Seward, Marcia L. Howe, Cummings, McClorey, Davis & Acho, Livonia, MI, for Robert Castleman, Officer.

Before: SILER and BATCHELDER, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

**BATCHELDER, Circuit Judge.**

In this case, the City of Southfield and several officers of the Southfield Police Department appeal the district court's finding that they are not entitled to summary judgment as to several claims brought under 42 U.S.C. § 1983 and Michigan law. We affirm the district court in part and reverse in part.

**I.**

The facts of this case revolve in large measure around an exercise of very poor judgment on the part of the defendant police officers. On May 17, 1988, at 3:30 p.m., plaintiff Barbara Walton [hereinafter Walton] was driving in her car with her two-year-old granddaughter, Courtney, and her 15–year–old daughter, Kamara, also plaintiffs in this matter. Walton testified that she had just left her doctor's office where she had been seeking treatment for an injured shoulder. Kamara was in the front seat and had her seat belt fastened. Courtney was in the back seat with a seat belt around her, but she was not in a child-restraint seat.[1] As Walton drove through the City of Southfield, Courtney began crawling from the back seat over into the front seat and onto the lap of her aunt, Kamara. Defendant Officer Keith Birberick testified that he observed Courtney standing on Kamara's lap. Kamara stated that, at her mother's direction, she sat Courtney on her lap and fastened her own seat belt around both herself and the baby. It is not clear whether Walton at that point pulled into a parking lot to secure Courtney or whether Officer Birberick pulled her over into the parking lot.

Officer Birberick approached the car and inquired why the baby was not in a child-restraint seat as required by Michigan law. He asked to see Walton's license, and after checking the license by radio, told Walton that he had been informed that her license had been suspended.[2] Officer Birberick asked Walton to get out of the car and placed

---

1. Walton had Courtney's child restraint seat in the trunk of the car.

2. Walton's license was suspended for having too many points. She claims that she never received

a notice of the suspension, although one was mailed. In addition, the evidence indicates that her license had also expired.

her under arrest. Walton claims that Officer Birberick was hostile and angry toward her.

At this point, defendant Officer Robert Castleman arrived as a backup. Castleman testified that Walton was hostile and uncooperative. Officer Birberick testified that he asked Walton to hold out the ends of her jacket and open it so that he could check for guns or knives in her waistband. He also searched the pockets of her jacket for weapons. Officer Castleman observed Officer Birberick pat down Walton's jacket pockets. Walton, however, testified that she was patted down her front, back and sides, not just on her jacket.

Officer Birberick then proceeded to handcuff Walton. Walton and Kamara testified that Walton asked Birberick not to handcuff her arms behind her because she had a sore shoulder and had just come from the doctor's office for treatment of it. Birberick claims that Walton asked not to be handcuffed but that she did not say why. Castleman testified that Walton said that she did not want to be handcuffed in front of the children. Officer Birberick then stated: "We can do this the easy way or the hard way." [3] Walton put her hands behind her back, and Officer Birberick then put on the handcuffs from behind Walton and put her into the police car.

At this point, Kamara and Courtney had gotten out of Walton's car. Castleman testified that Walton asked that the children be taken into protective custody. Officer Birberick responded that the officers could not do that,[4] but that the children could call someone to pick them up. Officer Birberick asked Kamara if there were someone she could call to come pick them up. Walton answered for Kamara that there was no one at home, and asked Officer Birberick if he would reach into her purse and take out some money to give her daughter. Walton claims that Birberick did not respond,[5] but instead asked Kamara whether she had money to make a phone call. When Kamara answered that she did, Birberick suggested that she go across the street to try to call someone. However, Walton told Kamara not to walk across the street with the infant. Upon Walton's request, Birberick found the number of a friend of Walton's in her address book and wrote the number down for Kamara. Birberick also testified that he gave Kamara the number of the Oakland County Jail where Walton would be taken. Before taking Walton to the police station, Officer Birberick watched to see that the children went into the office building next to the parking lot to make a call, but he did not wait to make sure the children had secured a ride home.

When Officer Birberick got into the police car, Walton testified that she was crying, asked that the handcuffs be removed, and asked to use a restroom. Birberick testified that Walton did tell him near the station that her shoulder was hurting, and Birberick replied that they would be at the station shortly. Once at the station, Walton was escorted to the Oakland County Jail Annex. There, the handcuffs were removed, and Walton was processed by a female deputy. During this process, Walton informed the deputy that her hands and fingers were hurting. Officer Birberick inquired whether she needed medical treatment, and Walton replied that she did not.

The female officer then escorted Walton to a holding cell with a toilet. Walton declined to use the toilet because the toilet area was not shielded sufficiently from the view of the officers and other prisoners. Walton used a pay phone in the cell to call her family.

Because Walton was pacing in the cell and rubbing her arm, the female deputy called for medical assistance. When EMS and the Fire Department arrived, Walton was released from the jail and taken to the hospital. She was diagnosed with heart arrhythmia

---

**3.** Although Walton testified that Officer Castleman made the statement, Castleman denied it. Instead, Officer Birberick testified that it was he who made the statement.

**4.** The officers testified that they believed they could not take minors into protective custody unless the minors had committed a crime.

**5.** Officer Birberick testified that police department policy did not permit him to give an arrestee's money to a third person.

and high blood pressure, and kept overnight at the hospital for observance.

Meanwhile, Kamara used the public phone in the office building to call her brother to tell him that she and Courtney needed a ride home. However, he did not have access to a car to pick them up. Kamara could not tell him exactly where she was, knowing only that she was in Southfield, and she had no more money. Eventually, a maintenance person in the building told the children that they would have to go outside because he had to lock up the building. At 9:30 p.m., six hours after being left by the police, Kamara and Courtney were finally picked up. Kamara claims that she has a history of chronic abdominal pain and that she experienced more pain while waiting for a ride. Courtney was left with a wet diaper and no food for the six hours.

Walton, Kamara and Courtney filed suit in district court under 42 U.S.C. § 1983 and state tort law against the City of Southfield and Officers Birberick and Castleman. They claimed that the officers conducted an illegal stop, an illegal arrest and an illegal search of Walton; used excessive force in arresting her; invaded her privacy; and violated due process by abandoning the children. Their claims against the City of Southfield were for vicarious liability for the officers' actions, for failure to train the officers, and for violating Walton's privacy right by not providing her with a toilet shielded from the view of others.

Defendants filed a motion to dismiss, which was denied. After further discovery, defendants then filed a motion to dismiss or for summary judgment, based in part upon qualified immunity. The district court granted the officers' motion for summary judgment on the basis of qualified immunity on the unlawful stop claim, but denied it on the claims of unlawful search, invasion of privacy, abandonment of the minor children and intentional infliction of emotional distress. The court denied to Officer Birberick but granted to Officer Castleman summary judgment on the basis of qualified immunity on the excessive use of force claim. The court denied summary judgment on the basis of state governmental immunity to both the City and the officers. 748 F.Supp. 1214.

The officers appeal the denial of summary judgment on the claims of 1) the abandonment of the children; 2) the illegal stop; 3) the illegal search; 4) the excessive use of force; and 5) invasion of privacy. The City appeals the denial of the motion for summary judgment as to the failure to train claim, and the City and the officers appeal the denial of state governmental immunity. After a discussion of qualified immunity, we address these issues seriatim.

## II.

We have jurisdiction over the qualified immunity issues because orders denying summary judgment on the basis of qualified immunity are immediately appealable as "final judgments" under the collateral order doctrine. 28 U.S.C. § 1291; *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Qualified immunity is a question of law for the district court, and therefore we review the denial of qualified immunity *de novo*. *Hall v. Shipley*, 932 F.2d 1147, 1150 (6th Cir.1991).

Government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a constitutional right to be clearly established, "the law must be clear in regard to the official's particular actions in the particular situation." *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991). This requires that

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent.

*Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) (citations omitted). Thus, the particular conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his or her conduct violated the constitutional right. *Long*, 929 F.2d at 1115. This "objective reasonableness" standard focuses on whether defendants reasonably could have thought that their actions were consistent with the rights that plaintiff claims have been violated. *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir.1988) (citing *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3038).

In inquiring whether a constitutional right is clearly established, we must "look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991), *cert. denied, —— U.S. ——*, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992).

> [I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988). Thus, it is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find "clearly established law."

The Supreme Court has noted that because qualified immunity is " 'an immunity from suit rather than a mere defense to liability,' we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, —— U.S. ——, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Mitchell v. Forsyth*, 472 U.S. at 526, 105 S.Ct. at 2815) (per curiam). This Circuit, too, has held that what is clearly established law and whether the officers acted reasonably are to be decided before trial. "Since the question is one of law, the trial court could not, by characterizing it as a disputed factual issue, avoid deciding [the issue]. The source for such determination is, of course, in federal constitutional, statutory or case law existing at the time. Any decision of the trial court should indicate that law and state the basis for its conclusion." *Dominque v. Telb*, 831 F.2d 673, 677 (6th Cir.1987). However, if genuine issues of material fact exist as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity is improper. *Poe v. Haydon*, 853 F.2d 418, 426 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989).

### III.

The defendant officers maintain that the district court erred in denying qualified immunity to them on the claim that they abandoned the children. We agree and reverse the district court on this issue.

The Supreme Court has not addressed whether abandonment of a minor by police could be a constitutional violation of the liberty interest in personal security. However, it has addressed the duty of government officials to protect persons against the acts of third persons. In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Supreme Court addressed the abuse of a child by his father and the department of social services' failure to prevent the abuse. The Court noted that the Due Process Clause does not require the State to protect the life, liberty or property interests of its citizens against invasions by private citizens, and that the Clause confers no affirmative right to governmental aid, even when that aid would be necessary to secure one of those basic interests. *Id.* at 196, 109 S.Ct. at

1003. The Court acknowledged that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 198, 109 S.Ct. at 1004 (citing *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (medical care to incarcerated prisoners); *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (safety to involuntarily committed mental patients)). The *DeShaney* Court held that

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 200, 109 S.Ct. at 1005–06. The Court stated that an affirmative duty to protect "arises not from the State's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200, 109 S.Ct. at 1006. It continued:

> In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty* —which is the "deprivation of liberty" triggering the protections of the Due Process clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

*Id.* at 200, 109 S.Ct. at 1008–09 (emphasis added).

*DeShaney,* then, does not impose an affirmative duty on the government to provide for a person's personal safety, unless the government has restrained that individual through "incarceration, institutionalization, or other similar restraint of personal liberty." Therefore, *DeShaney* does not recognize a clearly established right not to be abandoned by the police after they arrest the driver of the car in which one is a passenger. However-

er, neither does it foreclose the possibility that such a right could be clearly established if abandonment in a forlorn place were deemed a "similar restraint of personal liberty." .

Although *DeShaney* focuses on conditions during incarceration, an "other similar restraint" is not necessarily limited to incarceration. The Supreme Court found a deprivation of personal security in a non-incarceration context in *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), where the Court held that while in school, junior high school students had a protected liberty interest in personal security. *Id.* at 674, 97 S.Ct. at 1414. However, *Ingraham* may turn on the fact that public school students are compelled by state law to attend school and are not permitted to withdraw from situations posing the risk of personal injury. *See Reeves by Jones v. Besonen,* 754 F.Supp. 1135, 1140 (E.D.Mich.1991) (football player beaten up on bus was participating in voluntary activity). In any case, it is clear that the Supreme Court has not directly spoken on the issue of whether abandonment by state actors might be deemed a restraint on personal liberty.

Because the Sixth Circuit has not addressed whether abandonment by state or local actors can constitute a deprivation of the interest in personal security, we must look to the decisions of other circuits. However, we are to use these other decisions as a basis for a determination that the law is clearly established only if this is an "extraordinary case" in which the decisions of those other courts "both point unmistakably to the unconstitutionality of the conduct complained of and are so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Daugherty,* 935 F.2d at 784.

There is disagreement about the issue raised by this case, both among the circuits which have addressed it, and within one of those circuits. The two cases that had been decided by May of 1988 when this incident occurred reached different conclusions. In *White v. Rochford,* 592 F.2d 381 (7th Cir.

1979), several young children were riding in a car with their uncle when police stopped the car, arrested the uncle for drag racing, and left the children at the side of the road in cold weather. The children eventually were able to call for help, but in the meantime they suffered mental anguish and one child was subsequently hospitalized for a week. The Seventh Circuit held that the police had deprived the children of personal security when the officers "left helpless minor children subject to inclement weather and great physical danger without any apparent justification." *Id.* at 384. The court explained that the officers' actions showed gross negligence or reckless disregard for the safety of others because "the police could not avoid knowing that, absent their assistance, the three children would be subjected to exposure to cold weather and danger from traffic." *Id.* at 385.

In another Seventh Circuit case, however, *Moore v. Marketplace Restaurant, Inc.*, 754 F.2d 1336 (7th Cir.1985), the police had arrested a minor's parents and given the child the option of staying in a police squad car overnight or staying in the parents' camper alone overnight. The child stayed in the camper. The court held that although police could have given the minor better options and that the officers should have been more sensitive, the facts "do not arise to the level of a constitutional deprivation; however, they do demonstrate an exercise of extremely poor judgment." *Id.* at 1355. *See also Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (police not liable for murder because they did not put woman in danger, but only failed to protect her).

Three cases have been decided since the incident in this case, and these also are not in agreement. In *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990), police stopped a car at 2:30 a.m. in a high-crime district, determined that the driver was drunk, and arrested him. Plaintiff, the passenger, was told that she would have to get out of the car, but was not offered a ride out of the area. After looking for a place to call for help, plaintiff was attacked and raped by a third person. The court affirmed the denial of qualified immunity for defendants because "a police officer may be liable under section 1983 when he abandons passengers of arrested drivers under circumstances which expose them to unreasonable danger." *Id.* at 593.

In *Hilliard v. City and County of Denver*, 930 F.2d 1516 (10th Cir.), *cert. denied*, ——. U.S. ——, 112 S.Ct. 656, 116 L.Ed.2d 748 (1991), the plaintiff was a passenger in a car whose driver was arrested for drunk driving and taken into custody. Police told the plaintiff that she could not drive away from the scene because she appeared to be intoxicated too. Plaintiff was left in a high-crime area, and subsequently was raped and beaten. The Tenth Circuit held that it is unclear whether the right to personal security applies "where there is no element of state-imposed confinement or custody." *Id.* at 1520. The court concluded that it was not clearly established in 1988 "that someone whose person was not under some degree of physical control by the state ... would have a clearly established, constitutionally protected liberty interest." *Id.* The court summed up its opinion by holding that "[w]e are not persuaded ... that the plaintiff here has articulated the deprivation of a constitutional right, much less a 'clearly established' constitutional right." *Id.* at 1521.

In *Courson v. McMillian*, 939 F.2d 1479 (11th Cir.1991), a female passenger filed suit against police officers, who left her at the side of a highway at night without transportation after they arrested her two companions and had the car towed. *Id.* at 1496–97. The officers had asked the passenger if she needed a ride, and she was not left in a dangerous area or harmed as a result of the officers' actions. The Eleventh Circuit held that when the incident occurred in May of 1985, the officer was entitled to qualified immunity because no Supreme Court or Eleventh Circuit precedent existed regarding the abandonment of a passenger by officers. Although the court noted the "disappointing conduct" and "bad judgment" of the officers, "a law enforcement officer cannot be held to a standard of conduct which is unsettled by the Supreme Court or this circuit at the time

of his actions which are questioned." *Id.* at 1498.

Accordingly, we find that at the time of Walton's arrest in 1988, there was no clearly established right to personal security forbidding the police from abandoning passengers. *See DeShaney*, 489 U.S. at 194, 109 S.Ct. at 1002 (granting certiorari in that case "because of the inconsistent approaches taken by the lower courts in determining when, if ever, the failure of a state or local governmental entity or its agent to provide an individual with adequate protective services constitutes a violation of the individual's due process rights.") Although the *White* court had upheld that right at the time of the incident in this case, the Sixth Circuit had not recognized such a right and the Seventh Circuit in *Moore* had refused to recognize such a right. And, the *White* case is distinguishable from this case because the children in that case were left in a more dangerous situation. The three subsequent circuit decisions merely show that the circuits continue to be divided on the issue, although the most recent cases refuse to recognize such a right. Therefore, the "contours of the right," if there is such a right, were not sufficiently clear so that a reasonable officer would have known that leaving the children in the parking lot violated that right. *Anderson v. Creighton*, 483 U.S. at 639–40, 107 S.Ct. at 3034. The officers may have been insensitive and negligent in leaving the children behind, but they did not violate a clearly established right to personal security. Therefore, we reverse the district court's denial of qualified immunity to the officers on the claim of abandonment.

### IV.

The defendant officers also claim that they are entitled to judgment on the basis of qualified immunity for their stop of Walton for violation of the state child restraint law. Although both parties failed to recognize this, the district court, in both its written order and its ruling from the bench, did in fact grant summary judgment to the officers on the claim of an unlawful stop. In its ruling from the bench, the district court stated that because the police department had been stopping violators of the child restraint law as a primary stop and the officers were merely following that instruction, reasonable officers would not have known they were violating constitutional rights when they performed a primary stop under the child restraint law. Because the district court granted summary judgment for the officers on the illegal stop claim and the plaintiffs have not appealed that judgment, this issue is not before us.

### V.

Defendant officers next appeal the district court's denial of qualified immunity on the illegal search claim, which stemmed from the pat-down search of Walton. We find that the district court erred in denying qualified immunity to the officers on this claim.

■ Because the district court held that the officers were entitled to qualified immunity on the illegal stop claim, and because Walton was searched only after Birberick informed her that she was being placed under arrest, the search of Walton can be viewed as a valid search incident to a valid arrest. Although issues of fact exist about whether the search was merely a pat-down search or a full-blown search,[6] these factual issues are not material. Even under Walton's version of the search, it was not an unreasonable search incident to arrest. A search incident to arrest need not be a limited one, but may be a full search of the person for weapons and evidence. *Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969). *See also United States v. Robinson*, 414 U.S. 218, 235, 94 S.Ct. 467, 477, 38 L.Ed.2d 427 (1973). As the *Robinson* Court noted:

A police officer's determination as to how and where to search the person of a sus-

---

**6.** Birberick testified that he asked Walton if she was armed and she replied that she was not. He then asked her to hold out her jacket on the ends and open it up, and he observed that there were no guns or knives on the waistband. He then searched the outer pockets of the jacket for guns. Walton, however, testified that she was patted all over, including down her front, on her sides and on her back.

pect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search ... [I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a "reasonable" search under that Amendment.

414 U.S. at 235, 94 S.Ct. at 477. Because a full-blown search is justified if it is a search incident to arrest, the only remaining question is whether the search gave rise to a section 1983 claim because it violated a policy of the Southfield Police Department.

■ The district court held that because Southfield Police Department policy precludes a pat-down search by a male officer of a female arrestee, there was a genuine issue of fact as to whether the search, whether limited or a full pat-down search, was reasonable. It further held that Officer Castleman had the obligation to advise Officer Birberick of the policy or to take action consistent with the policy, and that his silence amounted to acquiescence. The court denied qualified immunity to both officers because of the department policy on searches.

■ Officer Castleman clearly was entitled to qualified immunity. For section 1983 liability to attach, Castleman either had to participate in the pat-down or had to be a supervisor of Birberick. For a supervisor to be liable for a subordinate's constitutional violation, there must a showing that the supervisor "at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.), *cert. denied,* 469 U.S. 845, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984). Because Castleman did not participate in the pat-down and there is no evidence that he was Birberick's supervisor, the denial of summary judgment to him was erroneous.

■ Officer Birberick also is entitled to qualified immunity on this claim. Officials "do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision." *Davis v. Scher-*er,* 468 U.S. 183, 194, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984). Officials become liable for damages only to the extent that there is "a clear violation of the statutory rights that give rise to the cause of action for damages." *Id.* at 194 n. 12, 104 S.Ct. at 3019 n. 12. Thus, violation of the department's policy prohibiting male officers from searching female detainees does not automatically result in a constitutional violation and an unreasonable search. As we held in *Washington v. Starke,* 855 F.2d 346, 349 (6th Cir.1988), whether state-enacted rules create a protected liberty interest depends on

"whether or not the state has imposed 'substantive limitations' on the discretion of [officers] ... or, in other words, whether the state 'has used language of an unmistakably mandatory character.' " *Franklin [v. Aycock* ], 795 F.2d [1253] 1260 [ (6th Cir.1986) ] (citations omitted). The *mandatory* nature of the regulation is the key, as a plaintiff "must have a legitimate claim of entitlement to the interest, not simply a unilateral expectation of it." *Bills v. Henderson,* 631 F.2d 1287, 1292 (6th Cir.1980).

*Id.* at 349. In *Starke,* the Court determined that the intra-departmental fleeing felon regulation did not present mandatory restrictions on deadly force but instead created discretionary restrictions that "still turn on the observations and conclusions of the individual officer...." *Id.* at 350. In addition, the Court held that in any case, the officers were entitled to qualified immunity because the regulation "would not have given rise to a cause of action for damages under either federal or Michigan law at the time of shooting," but only resulted in intra-departmental disciplinary action. *Id.*

■ We need not address whether violation of this policy prohibiting male officers from searching female detainees creates a legitimate entitlement that would give rise to a cause of action under federal or state law. This is because although defendants bear the initial burden of coming forward with facts to suggest that they were acting within the scope of their discretionary authority during the incident in question, the "ultimate burden of proof is on the plaintiff to show that the

defendants are not entitled to qualified immunity." *Washington v. Newsom*, 977 F.2d 991, 995 (6th Cir.1992) (quoting *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991)), *cert. denied*, — U.S. ——, 113 S.Ct. 1848, 123 L.Ed.2d 472 (1993). The plaintiff has the burden of establishing that "the defendants' conduct violated a right so clearly established that any official in defendants' positions would have clearly understood that they were under an affirmative duty to refrain from such conduct." *Id.* at 995.

Here, after Officer Birberick produced facts showing he was acting within the scope of his discretionary authority in arresting Walton, Walton did not meet her burden of proof. The plaintiffs merely state in their brief that the actual text of this departmental policy is not available because it is under protective order. However, they do not indicate that they have made any efforts to obtain this policy, nor have they made any showing that the policy is in fact mandatory. Because this policy is not available for our review and because plaintiffs have not made any showing that this policy is mandatory, we have no way of determining whether this is a mandatory policy creating a legitimate entitlement or whether Birberick violated a right so clearly established that a reasonable person would have known he had a duty to refrain. Therefore, Officer Birberick is entitled to qualified immunity on the unlawful search claim because plaintiffs have failed to show that he violated a mandatory departmental policy creating a legitimate entitlement.

## VI.

■ Defendants also appeal the district court's holding that they were not entitled to qualified immunity from liability on the invasion of privacy claim. We reverse the district court on this issue as well.

Walton argues that she did not use the bathroom at the Oakland County Jail because if she had, she would have been exposed to the view of male officers and male prisoners. She claims that not using the bathroom caused her to suffer pain and agony, as well as aggravation of other physical problems. The district court denied summary judgment, holding that "since the invasion of privacy issue arises out of the pat down search, the Court believes that this matter should remain." Thus, the district court apparently believed that because the pat-down search may have been unlawful, the treatment of plaintiff during the subsequent detention may have amounted to an invasion of privacy.

We need not address whether there is any federal constitutional or statutory right of access to a private bathroom in a jail or right of seclusion from male persons in a jail while using a toilet.[7] Officer Birberick and Officer Castleman did not violate any clearly established right of Walton's merely by delivering her to the jail. This jail was run by Oakland County, and Southfield police officers were directed to bring detainees to this jail. These officers had no control over the jail's design, and no ability to permit arrestees to use other facilities. Therefore, the officers clearly were entitled to qualified immunity on this claim because a reasonable officer would not have known that it was unlawful to take an arrestee to the designated jail.

To the extent that Walton is also complaining that the City of Southfield invaded her privacy by directing that she be taken to this jail, that issue is not before us on interlocutory appeal because it does not involve the issue of qualified immunity. *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1094 (6th Cir.1992) (only qualified immunity issue is properly before Court.)

## VII.

· ■ We next affirm the district court's denial of qualified immunity as a defense to Walton's claim that Officer Birberick used excessive force in arresting her, although for

---

**7.** We note that the First Amended Complaint is not clear as to the basis for this invasion of privacy claim. No state law invasion of privacy claim is asserted, and the section 1983 claim is only set out in general terms.

We also note that Walton's privacy in fact was not invaded because she declined to use the toilet facility provided in the jail.

reasons different from those stated by the district court.

The district court held that qualified immunity was not appropriate because the Southfield Police Department had a policy permitting the police to refrain from handcuffing arrestees under certain circumstances,[8] and that Walton qualified for this exception. It then concluded, without further reasoning, that Birberick was not entitled to qualified immunity.

 As noted above, an officer's failure to follow a department policy does not result in a constitutional violation unless the policy is sufficiently mandatory to create a legitimate entitlement amounting to a constitutionally protected interest. *Washington v. Starke,* 855 F.2d at 350. Although the Southfield Police Department's policy apparently is under a protective order, plaintiffs have not shown that they tried to obtain this policy or shown that the policy is in fact mandatory. Therefore, plaintiffs have not shown that the departmental policy was sufficiently mandatory so as to give rise to a legitimate claim of entitlement not to be handcuffed.

The analysis of the departmental policy violation is not dispositive of this issue, however. There are still genuine issues of material fact concerning whether Officer Birberick used excessive force in handcuffing Walton. An excessive use of force claim could be premised on Officer Birberick's handcuffing Walton if he knew that she had an injured arm and if he believed that she posed no threat to him.

 The right to be free from excessive force is a clearly established right. *Holt v. Artis,* 843 F.2d 242, 246 (6th Cir.1988). Excessive force claims are to be analyzed under the Fourth Amendment's "objectively reasonable" test, not under a substantive due process standard. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989); *Pleasant v. Zamieski,* 895 F.2d 272, 275 (6th Cir.), *cert. denied,* 498 U.S. 851, 111 S.Ct. 144, 112 L.Ed.2d 110 (1990). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1871.

In this case, the facts are disputed as to whether Birberick knew that Walton had a injured shoulder. Walton's version of the facts is that she begged not to be handcuffed because of her injured shoulder. In contrast, Birberick states that Walton never told him why she did not want to be handcuffed, and only told him her shoulder was hurting when they were travelling to the station. Although the right to be free from excessive use of force is clearly established, there is a genuine issue of material fact here as to whether the officer in fact used excessive force. Therefore, we affirm the district court's denial of qualified immunity on this issue.

## VIII.

 Defendant-appellant City of Southfield also claims that the district court erred in denying the City's motion for summary judgment on the claim that the City did not train its officers adequately. Because this claim is unrelated to the officers' qualified immunity defense, the denial of summary judgment is not reviewable on interlocutory appeal. *Rich,* 955 F.2d at 1094 (only qualified immunity issue is properly before Court); *Carlson v. Conklin,* 813 F.2d 769, 770–71 (6th Cir.1987), (interlocutory appeal extends only to qualified immunity defense and related determination of whether claim is stated under § 1983).

## IX.

 Finally, the defendant officers and the City contest the district court's denial of governmental immunity on the state law claims. This immunity issue is not properly before us.

The district court, in its written ruling on the motions, denied the individual officers' claim of governmental immunity, the City's

---

8. The policy apparently permits an officer to refrain from handcuffing an arrestee if the arrestee poses no real threat, or if the arrestee is elderly, pregnant or has an existing medical condition.

claim of governmental immunity as to the unlawful stop and as to the failure to train, and the defendants' motion for summary judgment as to the vicarious liability of the City for the claimed state torts. In its ruling from the bench, the district court held that the City was not immune from state tort liability because the officers' actions were not "mandated or authorized by the constitution, statute or law," and that the officers were not immune for state torts under M.C.L. § 691.1407 because they did not meet the requirements of the statute.

■ The district court's denial of governmental immunity to defendants is not a final decision under 28 U.S.C. § 1291. In a diversity case or a federal question action involving pendent state claims such as this one, *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), and *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), dictate that we must look to state immunity law to determine if a denial of immunity based on state law is appealable. *Brown v. Grabowski*, 922 F.2d 1097, 1106 (3d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *Sorey v. Kellett*, 849 F.2d 960 (5th Cir.1988). As this Court stated in *Marrical v. Detroit News, Inc.*, 805 F.2d 169, 172 (6th Cir.1986), "the right to an interlocutory appeal from the denial of a claim of absolute or qualified immunity under state law can only exist where the state has extended an underlying substantive right to the defendant official to be free from the burdens of litigation arising from acts taken in the course of his duties." *Id.* Thus, we must look at Michigan's law of immunity to determine whether the state has extended immunity from suit as well as immunity from liability.

Michigan's legislature has provided statutory governmental immunity under M.C.L. § 691.1407, M.S.A. § 3.996(107), for causes of action arising after July 7, 1986. This statute provides that governmental agencies engaged in a governmental function are immune from tort *liability.* § 691.1407(1), § 691.1401(f). It also states that officers and employees of governmental agencies are immune from tort *liability* if they believe they are acting within the scope of their authority, their agency is performing a governmental function, and they are not grossly negligent. § 691.1407(2), 691.1401(f).⁹ This statute is a codification of the judicially created governmental immunity doctrine established in *Ross v. Consumers Power Co.*, 420 Mich. 567, 363 N.W.2d 641 (1984). In *Reardon v. Department of Mental Health*, 430 Mich. 398, 424 N.W.2d 248, 254 (1988), the Michigan Court of Appeals noted that the statute "codified the *Ross* definition practically verbatim," *id.*, except for abolishing *Ross*'s ministerial versus discretionary test for individual immunity.

In *Marrical v. Detroit News, Inc.*, 805 F.2d 169, this Circuit held that a prosecutor,

---

9. The statute reads:

(1) Except as otherwise provided in this act, all governmental agencies shall be immune from tort *liability* in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function ... (2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency, each volunteer acting on behalf of a governmental agency, and each member of a board, council, commission, or statutorily created task force of a governmental agency shall be immune from tort *liability* for injuries to persons or damages to property caused by the officer, employee, or member while in the course of employment or service or volunteer while acting on behalf of a governmental agency if all of the following are met: (a) The officer, employee, member, or volunteer is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The officer's, employee's, member's, or volunteer's conduct does not amount to gross negligence that is the proximate cause of the injury or damage. As used in this subdivision, "gross negligence" means conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results.

(3) Subsection (2) shall not be construed as altering the law of intentional torts as it existed prior to the effective date of subsection (2). M.C.L. § 691.1407; M.S.A. § 3.966(107) (emphasis added).

In turn, governmental function is defined broadly as "an activity which is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." § 691.1401(f).

claiming absolute and qualified immunity under the *Ross* standard, was not entitled to appeal the denial of the immunity claims until after final judgment. The Court reasoned that Michigan law governed the state immunity claims and that Michigan law only provided an immunity from liability, not from suit. It held:

> Since we find no indication that Michigan's doctrine of absolute or qualified immunity includes a right to be free from the exigencies of trial, we conclude that Michigan law affords no basis for imposing on litigants the burdens of an interlocutory appeal.

*Id.* at 172. The Court's decision turned on the fact that the language in *Ross* referred to immunity from *liability, id.* at 173, and "nowhere included among its reasons for immunizing governmental officials the need to protect against the disruptions of pre-trial proceedings such as discovery or the burdens of trial other than the risk of ultimate liability in damages," *id.* at 174.

Since the *Marrical* decision, Michigan's new immunity statute, § 691.1407, has been enacted and it, not *Ross,* is applicable to the immunity claims in this case. Nevertheless, we find that *Marrical*'s reasoning is equally applicable in this case. As noted above, the statute was merely a codification of *Ross* almost verbatim. *Reardon,* 430 Mich. 398, 424 N.W.2d at 254. And, the statute, like *Ross,* discusses only immunity for governmental agencies and officers from *liability,* not from suit. Thus, we find that under M.C.L. § 691.1407 and the reasoning in *Marrical,* Michigan law confers only governmental immunity from liability, not from suit. Therefore, the denial of the immunity to the City—the government agency—and to the individual officers are not final appealable orders and therefore are not properly before us on interlocutory appeal. The City and the individual officers must wait until a final judgment is rendered to appeal the denial of immunity under state law.[10]

## X.

We **REVERSE** the district court's denial of summary judgment on the basis of quali-

fied immunity on 1) the abandonment issue as to both officers, 2) the illegal search claim as to both officers, and 3) the invasion of privacy claim. We **AFFIRM** the district court's denial of summary judgment on the excessive use of force claim as to Officer Birberick. We do not address the officers' appeal of the denial of qualified immunity on the illegal stop claim because the district court in fact granted the officers summary judgment based on qualified immunity on that claim. We do not address the denial of summary judgment on the failure to train claim against the City, the denial of state governmental immunity to all defendants, or the vicarious liability of the City for the state torts because these issues are not properly before us on interlocutory appeal.

---

10. Also, the district court's denial of the City's motion for summary judgment as to vicarious liability is also not properly before us on interloc-

utory appeal because it is unrelated to any immunity defense.