Cyril **TUREK**, Plaintiff–Appellee Cross–Appellant,

v.

Jeffrey **SALUGA**, Defendant–Appellant Cross–Appellee,

Randall **Wellington**, Mahoning County Sheriff, et al., Defendants.

Nos. 01–3986, 01–4018.

United States Court of Appeals, Sixth Circuit.

Sept. 24, 2002.

Before KENNEDY, SUHRHEINRICH, and BATCHELDER, Circuit Judges.

BATCHELDER, Circuit Judge.

Defendant–Appellant Jeffrey Saluga ("Saluga") and his fellow defendants appeal the district court's denial of their motion for summary judgment, based on qualified immunity, against the 42 U.S.C. § 1983 excessive force claim of Plaintiff–Appellee Cyril Turek ("Turek"). Turek cross-appeals the district court's dismissal of his state law false arrest and false imprisonment claims. Because the district court correctly concluded that summary judgment was inappropriate and because we have no jurisdiction to consider Turek's cross-appeal, we will affirm the judgment of the district court.

## Statement of Facts[1]

Turek and his wife Candace were divorced in November of 1998. The final divorce decree authorized Candace temporarily to have exclusive possession of the Mahoning County farm that they had jointly owned, though the decree also granted Turek leave to enter the property "for purposes of conducting his farm business and for emergency purposes." Turek's "farm business" was to maintain and feed twice daily the denizens of his barn:

---

1. Though there are a number of factual disputes in this case, we present here only the facts as viewed in the light most favorable to Turek. *See Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir.1999) ("[T]he issue on appeal [of a denial of summary judgment for qualified immunity] is not what facts the parties may be able to prove, but whether the plaintiff's facts, taken at their best, show a violation of clearly established law.") (citing *Johnson v. Jones*, 515 U.S. 304, 311, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)).

forty chickens, ten cats, eight ducks, seven pigs, three horses, two donkeys, two dogs, and a calf. Though the decree entitled Candace to reside on the property until July 30, 1999, by June of 1999 she had moved out, into an apartment. The decree provided that Candace would sell her interest to Turek by July 15, 1999; it also gave Turek the right to immediate possession once Candace was no longer using the property as her primary residence, but he opted not to exercise this right because of legal formalities involved.

On the hot evening of July 21, 1999, Turek arrived at the farm at around 9:40 p.m.—his first visit to his animals for the afternoon feeding. At the farm he was surprised to find a party underway: ten cars were in the driveway of the house, the doors of the house were open, and inside his 19 year-old son "C.J." was drinking beer with a number of his under-age friends. Turek told them they would have to leave; when they refused, he called the Mahoning County Sheriff's office and reported that minors were drinking alcohol on his property. (Turek himself had had nothing to drink, nor did he then.) C.J. then called Candace, who soon afterward arrived and found Turek in the barn feeding the animals.

Officer Saluga arrived about two minutes later, at 10:15; Turek met him in the driveway and asked him to break up the party. Saluga told Turek that he wanted to talk to Candace, and while Saluga returned to the house, Turek resumed his feeding chores. Candace presented to Saluga a copy of the divorce agreement, explaining that she had the exclusive right to reside in the house, that Turek had already been to the barn earlier in the day and had completed his farm work then, and that he had come back only to drink and to harass her and C.J.

Saluga returned to the barn and told Turek that he had to leave immediately, and though Turek offered to show him the divorce papers and said he would leave as soon as he finished feeding the animals, Saluga was not satisfied, telling Turek that according to Candace he had already fed the animals at 5:00 that afternoon. Turek explained that this was incorrect—that he had been on his way back from Ashtabula at that time, and that because of the heat it was imperative that he take care of the animals before he left—but Saluga nonetheless told him that he had to leave then or be arrested. Saluga later admitted that he had understood that Turek was one of the owners of the property (though he was in fact at this time the sole owner); that his understanding was that if Turek was the owner, he would have the right to order the teenagers off the property; that there was nothing in the decree that set a time limit for Turek's farm work; that neither Candace nor C.J. had indicated that Turek had threatened them; that Turek had not threatened him personally, nor had Turek done anything violent; that he had not been concerned for his personal safety; and that he had not seen Turek drinking, nor did Turek lose his balance or fall down, nor did Turek act in a way indicating that he was on drugs.

Saluga then arrested Turek, though he first asked him whether there was "anything wrong" with him. Turek told him that he had nerve damage in his right arm and shoulder, and that Saluga should handcuff him in the front and not in the back. Saluga told him that handcuffing in front was against department policy, and proceeded to handcuff him from behind—Turek offering no resistance. Turek immediately told Saluga that the cuffs were too tight and that his arm was hurting, but Saluga was impassive and led Turek up the driveway while holding the chain between the cuffs—Turek continuing to com-

plain that they were too tight and his hands were numb.

Saluga had Turek sit on a rock near his car (because Saluga had a police dog inside the car), while he talked with Candace—Turek again calling out in vain about the tight cuffs to the officer, who was about ten feet away. After a while another police car arrived and the officers loaded Turek in, though they had him sit in the car for some time while they talked with Saluga. They, too, ignored his complaints about the cuffs, and they left Saluga's cuffs on Turek until they arrived at the station. Turek spent several hours in jail and then was released on bond.

By the time the officers removed the cuffs from Turek at the station, both his hands were completely numb. The feeling in his left hand began to return while he was still at the station, but when the feeling in his right hand did not return even after several weeks and the hand proved unusable, he contacted a neurologist and was scheduled for an appointment in August. The neurologist indicated that the cuffs had caused a new neurologic injury to the ulnar nerve of Turek's right wrist, resulting in the loss of function to his right hand. Turek continues to have significant disability and loss of function with his right hand.

## I. Qualified Immunity for Excessive Force in Handcuffing

■ We review *de novo* an interlocutory appeal of a denial of summary judgment predicated on a claim of qualified immunity. *Mattox v. City of Forest Park,* 183 F.3d 515, 519 (6th Cir.1999). The first

question is whether the facts alleged, taken in the light most favorable to Turek, show that Saluga violated a constitutional right. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). We have held that the right to be free from excessive force is a Fourth Amendment right, and that an excessive force claim may be based on handcuffing. *See Walton v. City of Southfield,* 995 F.2d 1331, 1342 (6th Cir.1993) ("An excessive use of force claim could be premised on [the officer's] handcuffing [the plaintiff] if he knew that she had an injured arm and if he believed that she posed no threat to him.").[2] Hence the question turns to whether Saluga's alleged actions violated that right. Turek alleged that he posed no threat to Saluga, that he had nerve damage in his right arm and shoulder, that he communicated this to Saluga, and that Saluga nevertheless handcuffed him too tight and refused to loosen the handcuffs when requested. This sufficed to establish a violation of Turek's constitutional right not to be subjected to any objectively unreasonable use of force.

■ The next question is whether this right was clearly established—that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. This in turn compels us to give careful attention to the facts and circumstances of this particular case, including the severity of Turek's allegedly criminal activity, whether Turek posed an immediate threat to Saluga's safety, and whether Turek actively resisted arrest or attempted to evade arrest by flight. *See Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct.

---

**2.** Saluga argues that *Walton* is no longer good precedent, because in *Walton* we did not conduct the reasonableness inquiry that the Supreme Court later required in *Saucier,* and instead concluded that summary judgment was inappropriate because there was a mate-

rial issue of fact regarding whether the officer in fact used excessive force. *See Walton,* 995 F.2d at 1342. Nevertheless, though *Saucier* modifies this part of *Walton,* it does not disturb our finding in that case that an excessive force claim can be premised on handcuffing.

1865, 104 L.Ed.2d 443 (1989). We must also ask whether even if Saluga made a mistake, that mistake was nevertheless reasonable given what he knew at the time. *Saucier*, 533 U.S. at 206.

Viewing the facts in the light most favorable to Turek, we find that Saluga knew that Turek had an injury because he asked him about it, Turek described his injuries and asked Saluga to handcuff him in front, and Turek complained about the tightness of the handcuffs. Additionally—looking to the *Graham* factors—Turek's "crime" was not severe, he posed no threat to Saluga's safety, and he made no attempt to resist the arrest. Though Saluga correctly told him that it was against department policy to handcuff in front, the Mahoning County Sheriff's Policy Manual also provided an exception: "All persons taken into custody shall be handcuffed with their hands behind their backs. Where the health and safety of the suspect might be compromised, the suspect may be handcuffed with the hands in front." In light these facts, which for purposes of the summary judgment motion we presume to be true, we find that Saluga's conduct given what he knew at the time was not reasonable, and the district court properly denied summary judgment.

## II. Jurisdiction over Cross–Appeal of Dismissed State Law Claims

■ Turek requests that we consider his cross-appeals of his false arrest and false imprisonment claims that the district court dismissed, and invokes the collateral order doctrine and pendent appellate jurisdiction. Fed.R.Civ.P. 54(b) additionally allows a district court to enter final judgment prematurely under special circumstances (thus permitting an immediate appeal of the issue), but the district court did not do so in the present case.

In *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) the Supreme Court created the collateral order doctrine—a narrow exception to the final judgment rule for a "small class" of prejudgment orders. *Id.* at 546. The Court has since explained that to qualify, an order must (among other things) "be effectively unreviewable on appeal from a final judgment." *Richardson–Merrell, Inc. v. Koller*, 472 U.S. 424, 431, 105 S.Ct. 2757, 86 L.Ed.2d 340 (1985) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). There is no reason why Turek cannot appeal the dismissal of his claims after his case ends in a final judgment, and hence this doctrine does not render his claim reviewable.

■ Pendent appellate jurisdiction would be appropriate here only if Turek's false arrest and imprisonment claims were inextricably intertwined with his § 1983 claim, or if we had to address the dismissal of the former in order to meaningfully review the latter. *Swint v. Chambers County Comm'n*, 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). Though there is some factual overlap between Turek's state law claims and his § 1983 claim, the issues are not nearly inextricable: Saluga could have used excessive force even if he had a legal reason to arrest Turek, and vice versa.

## Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court denying summary judgment.