106 F.3d 1308
 Donald MARTIN, Plaintiff-Appellant/Cross-Appellee,
v.
Robert HEIDEMAN; Robert Heckle; Boone County, Kentucky,
Defendants-Appellees/Cross-Appellants,
Roger Paul; City of Walton, Kentucky,
Defendants-Appellees/Cross-Appellants.
 Nos. 95-5145, 95-5860, 95-5162 and 95-5170.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 23, 1996.
Decided Feb. 14, 1997.
Rehearing and Suggestion for Rehearing En Banc Denied April
29, 1997.*
 
 D. Craig Dance (argued and briefed), Breeding, McIntyre & Cunningham, Lexingtin, KY, for Donald Martin.
 W. Kenneth Nevitt, C. Thomas Hectus (argued and briefed), Williams & Wagoner, Louisville, KY, Steven J. Franzen, for Robert Heideman, Robert Heckle, Boone County, Kentucky in Nos. 95-5145, 95-5162 and 95-5170.
 MaryAnn Stewart (argued and briefed), Condit, McDermott & Stewart, Covington, KY, for Roger Paul, City of Walton, Kentucky.
 W. Kenneth Nevitt, C. Thomas Hectus (argued), Williams & Wagoner, Louisville, KY, Steven J. Franzen, for Robert Heideman, Robert Heckle, Kentucky in No. 95-5860.
 W. Kenneth Nevitt, C. Thomas Hectus (argued), Williams & Wagoner, Louisville, KY, Larry J. Crigler, Larry J. Crigler, P.S.C., Burlington, KY, for Boone County in No. 95-5860.
 Before: KRUPANSKY, DAUGHTREY, and MOORE, Circuit Judges.
 DAUGHTREY, J., delivered the opinion of the court, in which MOORE, J., joined. KRUPANSKY, J. (pp. 1313-33), delivered a separate dissenting opinion.
 DAUGHTREY, Circuit Judge.
 
 
 1
 In this civil rights action, brought under 42 U.S.C. § 1983, the plaintiff alleged that three Kentucky police officers used excessive force when arresting him. After the district court bifurcated the trial in order to try the liability and damages issues separately, a jury found that the defendants had not used excessive force against the plaintiff and returned a verdict in their favor. On appeal, the plaintiff challenges the district court's exclusion of certain evidence bearing on the extent of his injuries. Because the court excluded significant evidence of the severity of the plaintiff's injuries, impairing the plaintiff's ability to prove that the defendants used excessive force, we find it necessary to reverse and remand the case for a new trial. In doing so, we also reverse the trial court's directed verdict in favor of defendant Paul, on qualified immunity grounds, for his forceful handcuffing of the plaintiff.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 The plaintiff, Donald Martin, brought this action against three police officers and their two Kentucky employers, the City of Walton and Boone County, alleging that the officers used excessive force when arresting him. The complaint alleged that while the officers were arresting the plaintiff for a misdemeanor offense, they subjected him to "unlawful, harmful, unprivileged, and offensive conduct, including but not limited to, forcibly pushing him over a guard rail, pushing him to the ground, repeatedly thrusting his head and face against the pavement, twisting, pulling, and contorting his right hand, neck and head, and otherwise physically abusing him and subjecting his body to unnecessary force." Martin alleged injuries that included a fractured right clavicle; bruises and abrasions to the head, face, neck, shoulder; and permanent injuries to his right arm, elbow, hand, and shoulder. He sought damages pursuant to 42 U.S.C. § 1983, as well as several state law provisions.
 
 
 3
 After the district court denied the defendants qualified immunity in a decision later upheld by this court, the district judge held a status conference at which he decided to bifurcate the trial, trying the issue of liability first, and reserving the issue of damages for a later trial if necessary. The plaintiff objected to bifurcation and, after the conference, moved to vacate the bifurcation order, asking the court either to enlarge the number of trial days or to permit certain medical evidence at the first stage of trial. In response to the motion, the court upheld the bifurcation order and refused to allow Martin to present the testimony of Dr. Rettay, a chiropractor, or the testimony of two psychologists, Drs. Ganshirt and Bley, who suggested that Martin had post-traumatic stress disorder.
 
 
 4
 Several months later, the district court held another status conference, at which the bifurcation order was again discussed. The court stated that "[w]e're not going to put on doctors or anything, but if [the plaintiff] can show from the hospital records that he had a fractured skull or something, then we can determine the amount of force used." The judge indicated that he did not "have a problem with him saying he went to the emergency room. The problem [to be avoided] is getting in to him testifying of all the subsequent treatment." The plaintiff indicated that medical testimony about his subsequent treatment and surgeries would corroborate his account of the force used during the arrest. Finally, after considerable discussion about how many doctors would be allowed to testify by deposition, the court instructed the plaintiff to "[s]tick to causation only as far as what's going to be read at trial."
 
 
 5
 At trial, the witnesses had different accounts of the facts. Donald Martin and his friend, Michael Serra, both testified that they had collided in an automobile accident several weeks before the February 5, 1991, encounter with the defendant officers. Although Martin's car was damaged, the men agreed not to call the police because Serra was intoxicated and promised to pay Martin for the damages he caused. However, when the damage to Martin's car was more than Serra could pay, the two realized that they would have to file an insurance claim. Believing that the insurance company would require a police report, the two decided to recreate the accident. They staged the accident in the middle of the night on February 5, called the police, and acted as if the accident had just occurred. When Officer Roger Paul of the City of Walton arrived and suggested that the accident appeared to have been staged, he called for back-up and separated the two men. Officers Robert Heideman and Robert Heckle of Boone County soon arrived.
 
 
 6
 Martin testified that when he admitted to Officer Paul that the accident was staged, Officer Heideman began to shout at him profanely. Martin said that he backed up until he reached the guardrail, and finally yelled back at Heideman, prompting all three officers to jump on him. Martin alleged that he grabbed a nearby pole to avoid injuring himself, pushed the officers away, and fell to the ground. Officers Paul and Heideman allegedly pushed and shoved Martin's arms into his back, while Heckle placed his knee over Martin's neck and jaw. Finally, the officers allegedly handcuffed him too tightly despite his complaints that his hands were becoming numb. Martin insists that he again complained to Officer Paul in the cruiser that his hands were numb and swelling. After Martin was driven about 20 minutes to jail and after he waited another 15 minutes in a holding cell, Officer Paul finally loosened the handcuffs.
 
 
 7
 The officers' stories diverged. Officer Paul testified that after Martin admitted staging the accident, Paul decided to arrest him. Martin resisted arrest, and, according to Paul, it required three officers to arrest him. Paul's testimony at Martin's criminal trial had indicated, more specifically, that after being instructed to bring his hands down from behind his head in order to be handcuffed, Martin refused to do so and started "scuffing around."
 
 
 8
 Officer Heideman, on the other hand, testified that when he told Martin that he would be arrested, Martin became angry, started shouting profanities at him, and began moving towards him. Heideman tried to arrest him, but Martin resisted. They both fell over the guardrail, Heideman landing on top of Martin. Heideman testified that he then handcuffed Martin without assistance. Officer Heckle's story basically supported Heideman's version of the facts.
 
 
 9
 The district court limited the amount of medical evidence allowed more severely than it had indicated before trial. The court allowed the jury to hear the deposition testimony of Dr. Markesbery, Martin's family physician, about Martin's emergency room records on the day after the incident. The records showed that Martin had been diagnosed with contusions of the right arm and elbow, and a sore wrist. Two days later, Martin went to Dr. Markesbery's office and received pain medication for multiple contusions and strains. Although the jury was permitted to hear Markesbery's testimony about Martin's condition immediately after the incident, it did not hear deposition testimony about his subsequent visits to the doctor for tendinitis in the right elbow, although Markesbery speculated that trauma could cause tendinitis. The court also excluded Markesbery's testimony about previous injuries to Martin's right arm, neck, and right hand, and his conclusion that Martin's recent pain was unrelated to those injuries.
 
 
 10
 The court excluded the deposition testimony of Dr. Sommerkamp, an orthopedic surgeon who had diagnosed Martin as having posterior osseous nerve entrapment neuropathy, or a pinched nerve in the right elbow. Sommerkamp had testified in his deposition that it was "plausible, could even be considered probable" that the officers' conduct caused Martin's right elbow injury and that it was possible, although not probable, that they caused injury to Martin's shoulder and rotator cuff. Dr. Sommerkamp explained that it could take weeks or months from the date of an incident causing hyper-pronation for any symptoms such as Martin's to appear. During a mid-trial conference, the plaintiff proffered the deposition testimony of Dr. Sommerkamp, as well as Drs. Markesbery, Ganshirt, and Bley.
 
 
 11
 At the end of trial, the court directed a verdict in favor of Officer Paul, on the basis of qualified immunity, solely on the plaintiff's claim that Paul had applied the handcuffs too forcefully. The jury delivered a verdict in favor of all of the defendants, which forms the basis for the judgment that Martin now appeals.
 
 II. ANALYSIS
 
 12
 A. Exclusion of evidence following bifurcation
 
 
 13
 The plaintiff argues that the court denied him substantial justice by excluding evidence of the full extent of his injuries. He argues that he was not allowed to testify about his trip to the emergency room after the incident, nor about his injuries. He also complains that the court substantially limited the testimony of Dr. Markesbery, by allowing only a description of Martin's emergency room treatment and first doctor's office visit, and excluding evidence of subsequent visits. Martin insists that the court also erred by excluding Dr. Sommerkamp's testimony about Martin's two elbow surgeries allegedly caused by the defendants' treatment. Finally, Martin argues that the court erred by excluding evidence by Dr. Rettay, a chiropractor, as well as evidence about his post-traumatic stress disorder. Martin insists that all of this evidence about the extent of his injuries was essential to prove the amount of force used and to verify his credibility. He also argues that bifurcation should not be used in a manner that substantially and adversely affects the rights of a party. In re Beverly Hills Fire Litig., 695 F.2d 207, 217 (6th Cir.1982), cert. denied, 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983) (discussing judge's discretion to bifurcate, but warning of danger of depriving plaintiff of "legitimate right to place before the jury the circumstances and atmosphere of the entire cause of action").
 
 
 14
 In evaluating a challenge to the exclusion of evidence, this court will not reverse the district court's decision unless necessary to do "substantial justice." Fed.R.Civ.P. 61. In a bifurcated trial, the propriety of excluding evidence may also involve the appropriateness of bifurcating issues under Fed.R.Civ.P. 42(b). Bifurcation orders are reviewed for abuse of discretion, with the court required to consider the potential prejudice to the parties, the possible confusion of the jurors, and the resulting convenience and economy. In re Beverly Hills Fire Litig., 695 F.2d at 216.
 
 
 15
 After bifurcating the trial in this case into issues of liability and damages, the district court purported to limit the plaintiff's presentation of medical proof to evidence probative of liability. To determine whether the court improperly excluded evidence, we must look first to the elements of proof in a civil rights case claiming excessive force. In Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989), the Supreme Court held that the Fourth Amendment's reasonableness standard governs excessive force claims arising in the context of arrests. In determining the reasonableness of force used in an arrest, one must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " against the "governmental interests at stake." Id. at 396, 109 S.Ct. at 1871 (citing United States v. Place, 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)). The Court continued by saying that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872.
 
 
 16
 The Court's reference to the "nature and quality of the intrusion" must include consideration of the severity of any injury inflicted. When the district court limited evidence of the severity of Martin's injury to evidence collected immediately after the incident, it ignored the fact that the severity of an injury may not be apparent immediately after an accident. For example, an apparently sprained or bruised leg that does not seem to warrant immediate treatment might later reveal fractures indicative of a more severe blow. Such evidence would clearly be relevant to establish the amount of force used. Similarly, evidence of a plaintiff's psychological injury may reflect on the severity of the force used. And, although a defendant may be able to argue that he or she did not cause the subsequently appearing physical or psychological injuries, the causation question is one for the jury. In this case, the district court's attempt to draw a simple line excluding all evidence beyond the emergency room notes was error, requiring reversal. Moreover, because the extent of the plaintiff's damages was relevant to the question of liability, the district court abused its discretion by bifurcating the trial.
 
 
 17
 B. Directed verdict in favor of defendant Paul
 
 
 18
 In a second issue raised on appeal, the plaintiff challenges the propriety of the directed verdict entered by the district court in Officer Paul's favor on the question of excessive force in handcuffing. Defendant Paul responds that an arrestee's right to be free from too-tight handcuffing is not "clearly established" and, therefore, is not actionable under § 1983.
 
 
 19
 In Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), the Supreme Court held that:
 
 
 20
 [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 21
 Because most legal rights are "clearly established" at some level of generality, immunity would be impossible to obtain if a plaintiff were required only to cite an abstract legal principle that an official had "clearly" violated. Hence, in Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), the Court added that:
 
 
 22
 The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 23
 The district court found that at the time of the plaintiff's arrest, the law was not clearly established that the overly tight application of handcuffs was a violation of an arrestee's constitutional right not to have excessive force applied during an arrest, citing conflicting cases from around the country. See, e.g., Howard v. Dickerson, 34 F.3d 978 (10th Cir.1994)(handcuffing despite known medical condition; qualified immunity denied); Palmer v. Sanderson, 9 F.3d 1433 (9th Cir.1993)(handcuffing tight enough to cause bruising; qualified immunity denied); Greiner v. City of Champlin, 816 F.Supp. 528 (D.Minn.1993)(failure to loosen cuffs; qualified immunity upheld), aff'd in part & rev'd in part, 27 F.3d 1346 (8th Cir.1994); Cooper v. City of Virginia Beach, 817 F.Supp. 1310 (E.D.Va.1993)(no serious or lasting injury from tight cuffs; qualified immunity upheld), aff'd, 21 F.3d 421 (4th Cir.1994); Grooms v. Dockter, 1996 WL 26917, 76 F.3d 378 (6th Cir.1996) (per curiam ) (handcuffing caused permanent damage to wrists, carpel tunnel syndrome; qualified immunity denied); Elrich v. Wright, 1987 WL 44485, 829 F.2d 38 (6th Cir.1987) (per curiam)(bruising; qualified immunity upheld), cert. denied, 484 U.S. 1030, 108 S.Ct. 761, 98 L.Ed.2d 772 (1988); McPherson v. Auger, 842 F.Supp. 25 (D.Me.1994)(cries of pain caused by too-tight cuffs; qualified immunity denied).
 
 
 24
 This circuit, however, has chosen to view an "excessively forceful handcuffing" claim under the general excessive force rubric. In Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir.1993), we denied qualified immunity to an officer who handcuffed a woman with a shoulder injury. Although Walton was decided in 1993, the incident occurred in 1988, and we confidently denied qualified immunity because the case presented a genuine issue of fact regarding whether excessive force was used. Because clearly established law in 1991, the time of the incident in this case, prohibited an officer's use of excessive force, and because a genuine issue of material fact exists as to whether Officer Paul used excessive force under the circumstances, the district court erred by granting Paul qualified immunity on the handcuffing issue.
 
 
 25
 Finding that the district court denied the plaintiff substantial justice by excluding relevant, non-cumulative evidence of the severity of the plaintiff's injuries, and that the court further erred by directing a verdict in favor of defendant Paul, we REVERSE the judgment and REMAND the case to the district court for retrial.
 
 
 26
 KRUPANSKY, Circuit Judge, dissenting.
 
 
 27
 This is an appeal from a jury verdict absolving the defendant police officers of using excessive force DURING A FIVE TO THIRTY SECOND SCUFFLE that ensued while arresting and handcuffing a plaintiff who was resisting his detention.[1]
 
 
 28
 The incident arose when plaintiff, Donald Martin (Martin), and a co-conspirator, Michael Serra (Serra), were caught in the act of perpetrating a deception by staging a vehicular accident that occurred on some previously unspecified date before February 5, 1991, the night of the instant confrontation.[2] Both conspirators voluntarily admitted to the scheme at the scene when confronted by the obviously incompatible physical evidence at the site, and their inconsistent and facially contradictory statements. The acknowledged purpose of plaintiff's duplicitous conduct was to obtain an accident report to support a claim for money damages from plaintiff's insurance carrier. In the instant case, plaintiff again seeks money damages, this time from three police officers, charging them with using excessive force during a brief scuffle that ensued while he resisted being handcuffed after having been lawfully arrested. For purposes of this appeal, plaintiff charged that:
 
 
 29
 1. the district court committed reversible error by excluding certain medical evidence concerning the severity of injuries, thereby limiting his ability to prove the use of excessive force; and
 
 
 30
 2. the district court erroneously granted a directed verdict in favor of the defendant, Roger Paul, pursuant to the doctrine of qualified immunity.
 
 
 31
 The district court bifurcated the case for purposes of trial and deferred consideration of damages pending a resolution of all issues of causation.
 
 
 32
 To fully understand the trial court's evidentiary rulings, a more comprehensive summary of the facts than afforded by the panel majority is in order.
 
 
 33
 As previously indicated, the operative facts reflecting upon the purported use of excessive force occurred within a momentary time frame of between 5 and 30 seconds. The instantaneous eruption and conclusion of the incident in all probability accounted for inconsequential disparities between the testimony of certain witnesses.
 
 
 34
 Briefly summarized, the undisputed facts disclose that on February 5, the date of the incident giving rise to this action, Officer Roger Paul of the City of Walton, Kentucky was dispatched to Mary Grubbs Highway, Kentucky State Routes 14 and 16 above the Interstate 75 overpass to investigate a reported vehicular accident without injuries. Upon arriving at the site, he found Martin and Serra. After examining the scene of the collision, it became apparent to Officer Paul that it had not occurred shortly before his arrival as represented by Martin and Serra. Upon further inquiry, both Martin and Serra admitted that they had restaged a previous collision to generate a police accident report to support an insurance claim for money damages.
 
 
 35
 Confronted with an apparent violation of law--falsifying a police report--by two suspicious individuals who had staged an accident in the middle of the night in a lonely area and called for a police officer to respond, and concerned for his own safety and in an effort to provide verification for his observations, Paul requested additional police assistance. The Boone County Police Department dispatched Officers Robert Heideman and Robert Heckle to the location. After arriving, Heideman and Heckle conferred with Paul concerning the incident. The Boone County officers thereupon proceeded to examine the vehicles and the accident scene in the presence of plaintiff Martin, while Paul, who was approximately 100 or more feet away, conferred with Serra.
 
 
 36
 At that moment in time, plaintiff Martin was facing Heckle and Heideman with his back to a roadway guardrail approximately 2 feet behind him. At this juncture, disparities in the testimony of Martin, Heideman, Heckle, and Paul become controversial.
 
 
 37
 Martin described the ensuing 5 to 30 seconds by relating that Heideman, after having examined the collision site, became abusive and profanely accused him of lying while poking him in the chest with his finger. He further testified that, in an effort to avoid a confrontation with Heideman, he began to retreat. As he backed off, his calves hit the guardrail and he was thrown off balance and began "falling backwards:"
 
 
 38
 Q. Where were you standing in relationship to the guardrail and the speed limit sign shown in Exhibit No. 8?
 
 
 39
 A. Approximately maybe two feet away at first because while this was going on, I was backing up like inches at a time because of the pounding in my chest, and his nose is about that far, and he's hollering so loud, he's spraying me in the face hollering.
 
 
 40
 Q. What happened next?
 
 
 41
 A. I was irritated, and I kept saying [to myself] Donny, don't be crazy, there's three guys here and they are getting wild, and I kept telling myself to cool it, and I backed up far enough my calf hit the guardrail. Something was going to go and finally--
 
 
 42
 (J.A. at 304-05) (emphasis added.)
 
 
 43
 THE COURT: Clear up something. At this point they had told you you were under arrest?
 
 
 44
 THE WITNESS: No.... Officer Paul said you are going to be arrested.
 
 
 45
 THE COURT: Okay.
 
 
 46
 Q. Did anybody make the statement as they went for you "you are under arrest?"
 
 
 47
 A. There was a continuous--right after I did use profanity.
 
 
 48
 Q. They announced "you are under arrest?"
 
 
 49
 A. For resisting arrest, the same time they are attacking me.
 
 
 50
 * * * * * *
 
 
 51
 A. About the time I reach and hit the sign.
 
 
 52
 Q. Explain to the jury and demonstrate the movements, as best you can, as to what you did as you fell backwards.
 
 
 53
 A. I was standing ... and my calf is against the guardrail.... When they charge in on me, I started back like over the guardrail, and I'm stretching out for this sign there.
 
 
 54
 * * * * * *
 
 
 55
 Q. I think you had both hands on the sign and you were twisting around. Go ahead. I'll hold the microphone.
 
 
 56
 A. I was trying to get myself positioned back over on the blacktop and done my one [h]and on the pole, and in the meantime I got my body turned around sideways like that, and they were trying to pull my hands off the pole, they said, but they couldn't reach them, and I thought I got to get on the ground, and I said oh, my God, I better go over, and I pushed them over, and I pushed all three of them and laid on the gravel right there.
 
 
 57
 * * * * * *
 
 
 58
 THE COURT: Which side of the guardrail did you land on?
 
 
 59
 THE WITNESS: On the highway side, sir.
 
 
 60
 Q. What part of your body landed on the ground?
 
 
 61
 A. My stomach.
 
 
 62
 Q. You went down face first?
 
 
 63
 A. Yes, sir.
 
 
 64
 (J.A. at 306-08) (emphasis added.)
 
 
 65
 Q. Do you recall what happened after you grabbed the pole?
 
 
 66
 A. Yes, sir.
 
 
 67
 Q. Did you immediately let go of the pole or were you holding onto the pole for, say, as long as a half a minute or more?
 
 
 68
 A. I would say I was probably holding onto the pole for 20, 30 seconds to position and turn my head around and brace my head for being pushed on that pole.
 
 
 69
 Q. And then it was after that that you went to the ground, correct?
 
 
 70
 A. Yes, sir. After I got myself in position to push all three of us back over in the gravel, that's when we went back into the ground. They didn't pull my hands loose; they couldn't reach my hands.
 
 
 71
 Q. And, Mr. Martin, you've previously described what happened in that incident as "they just had ahold of me everywhere, honey. They grabbed ahold of my arms, but I thought I ain't turning loose this pole, you know, get over and away--back from the guardrail from it, and then when they did that, I seen I was going to fall. I had their weight going with me back over on the other side of the guardrail, you know, back on the highway side. I LET GO OF THE POLE, AND THAT'S WHEN WE WENT TO THE GROUND. THEY PUT ME FACEDOWN ON THE GROUND."
 
 
 72
 Was that a fair description?
 
 
 73
 A. I definitely held onto the pole because I thought my head would hit the post.
 
 
 74
 Q. And that's a fair description?
 
 
 75
 A. I LET GO OF THE POLE. THEY DIDN'T PULL ME FROM THE POLE. RIGHT. YOU ARE RIGHT.
 
 
 76
 (J.A. at 322-23) (emphases added.)
 
 
 77
 The plaintiff's co-conspirator Serra described the "5 to 30 second" operational facts in the following testimony:
 
 
 78
 Q. Where were the other two police officers?
 
 
 79
 A. Officer Paul would have been--if the shorter one was standing directly in front of Donny, Officer Paul would have been to his right and the other officer was directly on his left.
 
 
 80
 Q. That would be Officer Heckle?
 
 
 81
 A. Yes.
 
 
 82
 * * * * * *
 
 
 83
 Q. Mike, I want you to backtrack a little bit just to orient where you were. I believe you said that Officer Heideman was in the middle and front of Donny and Officer Paul I believe you said was on Mr. Heideman's left, and maybe I've got it wrong. I've got it wrong?
 
 
 84
 A. Yeah. They are facing directly at Donny. Officer Paul would have been to his right.
 
 
 85
 Q. Officer Heckle to the left?
 
 
 86
 A. Right.
 
 
 87
 * * * * * *
 
 
 88
 Q. And I think you said Officer Heideman was poking Donny in the chest, and you said he cussed at him?
 
 
 89
 A. Right.
 
 
 90
 * * * * * *
 
 
 91
 Q. What, if anything, did the other two police officers do at that time?
 
 
 92
 A. AT THAT TIME WHEN DONNY STARTED FALLING BACKWARDS, they all three went toward him.
 
 
 93
 Q. Where was Donny standing in relationship to the guardrail which was in the vicinity of him and that speed limit sign you referred to?A. He was standing right directly--See where the rivets are in there?
 
 
 94
 Q. Uh-huh.
 
 
 95
 A. Right in there, maybe a little bit to the right of the rivets.
 
 
 96
 * * * * * *
 
 
 97
 Q. What, if anything, did Donny and the police officers do as Donny went back over this guardrail?
 
 
 98
 A. WHEN DONNY WENT BACK, HE WAS OFF BALANCE AND HE GRABBED AHOLD OF THE RAIL.
 
 
 99
 Q. What are you talking about?
 
 
 100
 A. HE GRABBED AHOLD OF THE SIGN WHEN HE WENT BACKWARDS.
 
 
 101
 Q. The signpost here?
 
 
 102
 A. Right. When he hit him in the chest, he knocked him off balance, and he went back. I don't know which hand he grabbed with, but he grabbed the sign to keep from going over the railing.
 
 
 103
 Q. What else happened?
 
 
 104
 A. Well, I guess they thought that because he was hanging onto that sign, that he was trying to resist arrest, and they are all three grabbing his arms and everything and jerking him off the sign to throw him down on the ground to cuff him.
 
 
 105
 Q. How long do you think it took for him to get to the ground?
 
 
 106
 A. Just guessing, I would say it was probably 30 seconds or in that area.
 
 
 107
 (J.A. at 403-08) (emphases added.)
 
 
 108
 Heideman's version of the "5 to 30 second" incident recited:
 
 
 109
 Q. Why don't you go ahead and take the jury through your recollection of what happened after you went back and confronted him with the fact that you didn't believe his story and he was going to be cited for filing a false report by Officer Paul. Go ahead and pick it up and explain to the jury what happened.
 
 
 110
 A. Okay, at this time when I went back to him the second time, I told him what we were going to do or what Officer Paul was going to do. He started getting pretty upset, and he made some kind of statement to the fact you mother fuckers don't know what you are [d]oing, this is a bunch of shit. I told him at that time to calm down, all he was going to do was get a traffic ticket to court, it wasn't that big a deal, there wasn't no sense in getting out of control here. He made some kind of comment there, and he was getting very irate.
 
 
 111
 After I told him just to calm down, he settled down for a couple three seconds, and then he took a step forwards and said some other kind of derogatory term, something to the effect that you mother fuckers don't know what you are doing, you can't do this to me; and he took a step toward me, and I took one step back, and he was starting to yell and scream a little louder. As he took another step, I told him that's enough, you are under arrest, and I reached out for him.
 
 
 112
 Q. How did you reach out for him? Explain how you did that.
 
 
 113
 A. I was standing sort of where my left side would have been towards him. It's called an interview stance. Just--Can I stand up and show you?
 
 
 114
 Q. Sure.
 
 
 115
 A. Anyway, when we speak to somebody, we stand sort of in this fashion. And as he stepped forward, I have taken one step or half a step back, and when he made another step toward me, that's when I determined he was becoming well out of control, it was time to stop what was going on, and I would have reached for him probably with both hands.
 
 
 116
 Q. What did you tell him when you reached for him?
 
 
 117
 A. I believe I told him he was under arrest.
 
 
 118
 Q. For what?
 
 
 119
 A. At the time I believe I may have told him he was under arrest for disorderly conduct or we were going to arrest him for the falsely reporting the incident or I may have just told him he was under arrest, I don't remember.
 
 
 120
 * * * * * *Q. You went to arrest him for disorderly conduct?
 
 
 121
 A. Yes.
 
 
 122
 Q. And you reached for him?
 
 
 123
 A. Yes, sir.
 
 
 124
 Q. What part of his body were you reaching for?
 
 
 125
 A. Whatever was towards me I guess. I don't recall exactly what part of his body was turned towards me at that time. It happened very quickly, a matter of seconds.
 
 
 126
 Q. Do you recall telling me at the deposition that you reached out for his arm and he turned to leave from you and he pulled away, and you had to reach for him again because you don't have him under control?
 
 
 127
 A. I don't think I said that. I thought what I told you in the deposition was as I reached for him, I grabbed--I believe I told you I had tried to grab onto some parts of his upper body. I don't remember specifically telling you I grabbed hold of his arm. I told you I might have grabbed his arm. As I reached for him, he turned--he squared towards me a little bit, and he turned to his left and tried to go away from me, and at that time I may have grabbed onto his arm.
 
 
 128
 Q. But in any event you tried to put your hands on him and he tried to get away from your hands?
 
 
 129
 A. That's correct.
 
 
 130
 Q. What happened next?
 
 
 131
 A. As he turned to his left and he started to go away from me, at that time I was--I had taken a couple steps and I was getting closer to him, and I actually my hands on him--I don't remember what part of his body--his legs met with the guardrail and we both fell over it.
 
 
 132
 Q. Were you pretty close to the guardrail when it started?
 
 
 133
 A. When it started, he was sitting on the guardrail or standing right next to it, so at any given time he would have been probably two steps away from it, the best I can remember.
 
 
 134
 Q. Did you all go over the guardrail in the course of this encounter?
 
 
 135
 A. That's correct.
 
 
 136
 Q. Did that--is that the next thing that happened once you met him?
 
 
 137
 A. Yes. As he turned and I grabbed onto him, his legs hit the guardrail, and we both fell over the guardrail.
 
 
 138
 Q. And the force knocked him over the guardrail?
 
 
 139
 A. Not backwards, no. He had his back towards me and he had turned to his left, and he was either sideways because he wound up landing facedown on the dirt and stuff.
 
 
 140
 Q. On the other side of the guardrail?
 
 
 141
 A. Yes.
 
 
 142
 * * * * * *
 
 
 143
 A. If you guys were on the other side of the guardrail--Like this is the guardrail, at first he started talking to me like that. By the time I got up to him, he was in this fashion. His left side was pretty much squared as best I can remember and his legs hit the guardrail in that fashion, and he fell over that way, me basically on top of him.
 
 
 144
 Q. You went over the guardrail on top of him?
 
 
 145
 A. Yeah.
 
 
 146
 Q. He landed on his face?
 
 
 147
 A. Face or side, he would up--once we settled, he was on his stomach and I was partially on top of him or was laying right next to him.
 
 
 148
 Q. Then what happened?
 
 
 149
 A. Anyway, once we landed on the other side of the guardrail, everything was pretty much over. I told him to put his hands behind his back, and he did and I handcuffed him and that was it.
 
 
 150
 * * * * * *
 
 
 151
 Q. Once you put the cuffs on him, what did you do with him then?
 
 
 152
 A. We stayed on the ground for a few seconds. I believe Officer Heckle helped me to get him up off the ground. There's a way to get somebody up when they are on the ground if they aren't injured in any way. You turn them and have them sit on their leg and stand them right up, and we took him and put him in Officer Paul's cruiser.
 
 
 153
 * * * * * *
 
 
 154
 Q. Officer, is it my understanding, based upon your testimony, that Mr. Martin became irate after--only after you told him he would be charged with falsely reporting an incident?
 
 
 155
 A. He became irate after I informed him that Officer Paul would cite him for that and no accident report was going to be made. I'm not sure which one of those set him off.
 
 
 156
 Q. And the reason you went over to talk to Mr. Martin was to inform him what was going on?
 
 
 157
 A. That's correct.
 
 
 158
 Q. And when he became irate, did he become angry?
 
 
 159
 A. Yes, sir--yes, ma'am.
 
 
 160
 Q. Is that when he started to become loud?
 
 
 161
 A. Yes, ma'am.
 
 
 162
 Q. And is it my understanding, looking at your deposition and what you have said today, he was saying things along the line this is a bunch of bullshit?
 
 
 163
 A. Things along those lines. He was becoming very out of control, very irate.
 
 
 164
 Q. And he also said "you mother fuckers don't know what you are doing out here?"
 
 
 165
 A. Something to that effect, yes, ma'am.
 
 
 166
 Q. So really kind of angry that he was being charged with this criminal offense?
 
 
 167
 A. He was very angry over one of the two factors. I really don't know which one set him off.
 
 
 168
 Q. And this occurred a little after midnight?
 
 
 169
 A. Yes, ma'am.
 
 
 170
 Q. And you were in the middle of an interstate?
 
 
 171
 A. Actually, we were on Mary Grubbs Highway which is Kentucky 14 over top of I-75 in Walton.
 
 
 172
 Q. So you were over top the interstate and there were cars going back and forth, is that correct?
 
 
 173
 A. That's correct.
 
 
 174
 Q. And you indicated in your testimony, in that type of situation, it's important to control the situations, to control the suspect. Why is that?
 
 
 175
 A. At the rate he was going, he was actually placed into custody for his own safety. He was becoming out of control, and if I had taken one more step back from him, I would have been into the middle--I would have been into the travel portion of Mary Grubbs Highway. You just have to control the scene, and he had lost it by then.
 
 
 176
 Q. And you had to look out for his safety but also officer safety as well?
 
 
 177
 A. That's correct, yes, ma'am.
 
 
 178
 (J.A. at 265-71 & 282-84.)
 
 
 179
 Paul's testimony of the 5 to 30-second episode related that while questioning Serra, he began hearing loud "verbalizations" from the area where Martin, Heideman, and Heckle were standing:
 
 
 180
 Q. You remember you were doing something or about to do something with Mr. Serra?
 
 
 181
 A. Yes. I was already engaged in a conversation with him or I was about to talk with him when I heard this going on.
 
 
 182
 Q. You are headed that direction?
 
 
 183
 A. Yes.
 
 
 184
 Q. What happens next?
 
 
 185
 A. I turn and go back to the location where Officers Heideman and Heckle and Mr. Martin was at because it sounded like things were getting out of control and--
 
 
 186
 Q. Let me stop you right there. We'll get to this in a second. When you left them, weren't they generally down here, Officers Heckle, Heideman and Martin?
 
 
 187
 A. I can't testify where they were at.
 
 
 188
 Q. So you went back to them. Where had they gone?
 
 
 189
 A. When I went back, they were back on the west side of the bridge where the signpost is at.
 
 
 190
 Q. When you are going back, you hear this loud conversation over here in this area?A. Yes.
 
 
 191
 Q. Of course that's a lot closer to you than the area Donny had previously been, right?
 
 
 192
 A. Yes.
 
 
 193
 Q. That's a hundred-and-some-odd feet, right?
 
 
 194
 A. Estimated, yes, sir.
 
 
 195
 Q. So somehow the three of them got from over here somewhere to over here somewhere by the signpost?
 
 
 196
 A. Yes.
 
 
 197
 * * * * * *
 
 
 198
 Q. I think you returned to the area where the three of them were?
 
 
 199
 A. Yes.
 
 
 200
 Q. If I recall from your earlier testimony they were in the area of the signpost?
 
 
 201
 A. Yes.
 
 
 202
 Q. And you walked up to the vicinity just like you explained earlier where everybody was about three or four feet away?
 
 
 203
 A. Yes.
 
 
 204
 Q. What's happening?
 
 
 205
 A. At that point in time I'm not real sure there was still conversations going on.
 
 
 206
 Q. So, more than one person was speaking?
 
 
 207
 A. Yeah. As I approached them was when somebody announced, as you said before, you are under arrest. At that point in time I saw Mr. Martin turn, grab onto the signpost, and he would not let go.
 
 
 208
 Q. At that point in time nobody touched him?
 
 
 209
 A. No.
 
 
 210
 Q. He was not pushed against the signpost? He was not pushed and grabbed the signpost to keep from falling? He turned around and grabbed the signpost so nobody could get him?
 
 
 211
 A. There's how I perceived it, yes, sir.
 
 
 212
 * * * * * *
 
 
 213
 Q. All right. Once he did that, what happened?
 
 
 214
 A. At that point in time what I remember doing, I grabbed Martin's right hand.
 
 
 215
 Q. What did the other two police officers do?
 
 
 216
 A. I can't testify specifically what their actions or movements were.
 
 
 217
 Q. Generally what did they do?
 
 
 218
 A. I can't even tell you generally. I do know that Officer Heideman did have ahold of Mr. Martin somewhere along the line.
 
 
 219
 Q. He's holding onto a signpost?
 
 
 220
 A. Yes, sir.
 
 
 221
 Q. With both hands?
 
 
 222
 A. Yes, sir.
 
 
 223
 Q. You've got one hand?
 
 
 224
 A. I'm attempting to get one hand.
 
 
 225
 Q. Somebody else has the other one?
 
 
 226
 A. Yes.
 
 
 227
 Q. And somebody else probably also has his hands on Mr. Martin involved in extricating Mr. Martin from the post, fair statement?
 
 
 228
 A. I suppose, yes, sir. Like I said, my memory is not as good as it was--as it would have been two or three years ago.
 
 
 229
 * * * * * *
 
 
 230
 Q. Can you describe, in your own words, how Donny was moved from the signpost and eventually handcuffed and arrested?
 
 
 231
 A. As I said before, I had ahold of his right hand. He had ahold of the signpost and would not let go. We eventually were able to get him to let go of the signpost, brought him down to the ground, and he was placed in the handcuffs.
 
 
 232
 (J.A. at 363-67.)
 
 
 233
 Obviously, from the record of testimony, the 5 to 30-second incident here in issue did not evoke the specter of law enforcement personnel clubbing, kicking, punching, or brutally beating a bleeding plaintiff, or even threatening him with weapons or physical bodily harm while executing his arrest. It was a momentary scuffle that resulted when the plaintiff, while refusing to be handcuffed, backed away from the officers into a roadway guardrail, causing him to lose his balance and to fall backwards onto the roadside berm.
 
 
 234
 In determining if the force used to effect a particular seizure is reasonable, "Fourth Amendment jurisprudence has long recognized that the right to make an arrest ... carries with it the right to use some degree of physical coercion or threat" of physical force to effect custody. Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989) (citing Terry v. Ohio, 392 U.S. 1, 22-27, 88 S.Ct. 1868, 1880-83, 20 L.Ed.2d 889 (1968)).
 
 The Supreme Court has stated:
 
 235
 The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.... With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.
 
 
 236
 As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "OBJECTIVELY REASONABLE " in light of the facts and circumstances confronting them, without regard to their underlying intent of motivation.
 
 
 237
 Id. at 396-97, 109 S.Ct. at 1872 (citations omitted & emphasis added)
 
 
 238
 Mindful of the above directive, this appellate review must, at the threshold of its deliberations, determine if the jury's verdict absolving the police officers of using excessive force during the crucial 5 to 30 seconds required to place the plaintiff into custody was supported by SOME COMPETENT, CREDIBLE EVIDENCE which would end the inquiry and foreclose setting the jury's verdict aside.
 
 
 239
 In addressing the finality of jury verdicts, the Supreme Court has, in no uncertain terms, mandated that:
 
 
 240
 It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. COURTS ARE NOT FREE TO REWEIGH THE EVIDENCE AND SET ASIDE THE JURY VERDICT MERELY BECAUSE THE JURY COULD HAVE DRAWN DIFFERENT INFERENCES OR CONCLUSIONS OR BECAUSE JUDGES FEEL THAT OTHER RESULTS ARE MORE REASONABLE.
 
 
 241
 Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) (citations omitted & emphasis added).
 
 
 242
 This circuit has consistently echoed that admonition. In Anchor v. O'Toole, 94 F.3d 1014 (6th Cir.1996), the court stated:
 
 
 243
 Consequently, the scope of review of a damage award is extremely narrow. A trial court may not grant a new trial on the ground of insufficient damages UNLESS THE JURY VERDICT IS ONE THAT COULD NOT REASONABLY HAVE BEEN REACHED. The remedy of a new trial for inadequate damages is appropriate only where the evidence indicates that the jury awarded damages in an amount substantially less than unquestionably proved by the plaintiff's uncontradicted and undisputed evidence. THUS, IF THE VERDICT IS SUPPORTED BY SOME COMPETENT, CREDIBLE EVIDENCE, A TRIAL COURT WILL BE DEEMED NOT TO HAVE ABUSED ITS DISCRETION IN DENYING THE MOTION.
 
 
 244
 Id. at 1021 (citation omitted & emphases added).
 
 
 245
 Also, in Portage II v. Bryant Petroleum Corp., 899 F.2d 1514 (6th Cir.1990), the court again reaffirmed its position:
 
 
 246
 '[C]ourts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 35 [64 S.Ct. 409, 412, 88 L.Ed. 520] (1944); Werthan Bag Corp. v. Agnew, 202 F.2d 119, 122 (6th Cir.1953). Thus, while the district judge has a duty to intervene in appropriate cases, the jury's verdict should be accepted if it is one which could reasonably have been reached.
 
 
 247
 Bruner v. Dunaway, 684 F.2d 422, 425 (6th Cir.1982). See also Berner, 346 F.2d at 536 ("[W]here ... there is an evidentiary basis for the jury's verdict, the jury is free to discard or believe whatever facts are inconsistent with its conclusion. And the appellate court's function is exhausted when that evidentiary basis becomes apparent, it being immaterial that the court might draw a contrary inference or feel that another conclusion is more reasonable.").
 
 
 248
 Id. at 1523-24 (alterations in original).
 
 
 249
 In assessing the evidence developed during the trial of the instant case against the Supreme Court mandate and this circuit's existing precedent, the panel majority abuses its appellate responsibility.
 
 
 250
 At the conclusion of the evidence, the jury was presented with two basic scenarios. The panel majority's inference to the contrary, the disparities between the plaintiff's version of the 5 to 30-second incident, and the versions of Officers Heideman, Heckle, and Paul were relatively inconsequential when reviewed in juxtaposition.
 
 
 251
 Subsequent to the exchange of accusations and profanities, plaintiff accused Heideman and Heckle as the instigators. Heideman and Heckle attributed the initiation of profanities to the plaintiff when he became irritated (which he has admitted) upon being advised that Paul was about to issue a citation against him and Serra for falsifying a police report. The officers also explained that he became progressively more agitated, animated and belligerent when Heideman placed him under arrest for disorderly conduct and, as a result of his truculence and verbally abusive manner, plaintiff refused to be handcuffed. In any event, all accounts agree that plaintiff refused to be handcuffed and retreated backward into a roadway guardrail. As Heideman reached for him, plaintiff's calves contacted the guardrail and he lost his balance, falling over the guardrail carrying Heideman with him, who fell on plaintiff's back. Heideman testified that, while in that position, he brought plaintiff's arms behind him and placed the handcuffs on his wrists, at which point the incident ended. Plaintiff was assisted to a standing position and escorted to and placed into Paul's police cruiser. Heckle corroborated Heideman's testimony.
 
 
 252
 Plaintiff testified that as Heideman approached him, he retreated into the guardrail causing him to lose his balance and fall backwards, whereupon he grabbed a signpost situated on the berm of the roadway to keep from falling to the ground. He testified further that all three of the officers thereupon attempted to disengage his hands from the signpost when he, the plaintiff, fell to the berm of the roadside.
 
 
 253
 Apart from the testimony of various participants, as related in the record, the trial judge permitted the introduction of plaintiff's extensive subjective complaints, together with objective clinical findings that resulted from a physical examination conducted just hours subsequent to the incident in the ambulatory service emergency room at St. Luke's Hospital West, where he, the plaintiff, had been referred by his family physician, Dr. Harold Markesbery.
 
 
 254
 The objective clinical findings are consistent with the testimony of plaintiff's fall onto the roadside berm. Dr. Markesbery's reason for the requested examination was plaintiff's subjective complaint of "injury R [right] arm and shoulder"--"R elbow, R shoulder, L wrist." The hospital report of plaintiff's examination states:
 
 
 255
 This 50-year-old man was in an altercation last night and states that he injured his right shoulder, right elbow and left wrist. Apparently he had his hands placed over his head and there was a certain amount of hyperextension to his arms at his shoulders. He also had handcuffs put on his hands and the left wrist became irritated because of the handcuffs. At this time, he denies any loss of sensation in his hands bilaterally. PHYSICAL EXAMINATION: RIGHT SHOULDER REVEALS FULL RANGE OF MOTION. HE IS TENDER OVER THE DELTOID AREA. NO AREA OF SWELLING OR DISCOLORATION. RIGHT ELBOW DEMONSTRATES FULL RANGE OF MOTION WITH THE MOST PAIN PRODUCED BY FULL EXTENSION. THERE IS NO SWELLING OR CONTUSIONS OVER THE ELBOW. THE LEFT WRIST DEMONSTRATES AN AREA OF ERYTHEMA (IT APPEARS TO BE A SKIN BURN) PROXIMAL TO THE DISTAL FIBULA ON THE LATERAL ASPECT OF THE ARM. HE IS MILDLY TENDER IN THIS AREA. THERE IS FULL RANGE OF MOTION OF THE WRIST. THIS MAN IS NEUROVASCULARLY INTACT IN BOTH UPPER EXTREMITIES.
 
 
 256
 (J.A. at 112) (emphasis added.)
 
 
 257
 The report references no discoloration. X-rays taken as a part of plaintiff's examination contradict his claim of a fracture to his right clavicle attributable to the incident:
 
 
 258
 I examined the right clavicle with great care and could not ascertain if there was any tenderness. The patient tells me that he had possible clavicular fracture during high school. Radiological exam demonstrates a questionable greenstick fracture of his right clavicle. IN VIEW OF HIS CLINICAL EXAM, I DO NOT BELIEVE THIS IS A FRACTURE.
 
 
 259
 (J.A. at 113) (emphasis added.)
 
 
 260
 Dr. Markesbery's requested x-rays of plaintiff's right elbow, including oblique views, "Reveal no acute fracture, significant bone, joint, or soft tissue abnormality" and x-ray studies of his left wrist, including oblique views, "Reveal no acute fracture, significant bone, joint or soft tissue abnormalities." (J.A. at 115.)
 
 
 261
 It is difficult to determine from Dr. Markesbery's correspondence or testimony if his medical opinions and conclusions were derived from his personal knowledge and examinations of the defendant before April 9, 1991, some sixty three days after the incident. The record implicates that plaintiff's examinations and treatment during the interim period were conducted by Dr. Markesbery's associate, Dr. Baker, during two visits on February 7 and March 16, 1991. Dr. Baker's record of treatment on February 7, 1991 notes that the plaintiff complained "arm sore and numb, wrist hurt, treated Tuesday a.m. [Feb. 5,] at St. Luke West, neck stiff, given Naprosyn and Tylenol No. 3"--anti-inflammatory medicine which was refilled on March 16, 1991, without further examination or treatment. Dr. Baker's diagnosis on the February 7, 1991 VISIT WAS MULTIPLE CONTUSIONS, STRAINS, AND A FINDING OF A FRACTURED CLAVICLE, (an incorrect finding). There are no references in his notes of discoloration or swelling. Dr. Baker also stated that "most of his [plaintiff's] discomfort was related to a fractured clavicle." (J.A. at 120.) It is, however, conceded by all parties that this finding of a "fractured clavicle" were erroneous and incorrect. Nevertheless, Dr. Markesbery was permitted, over objection, to interpret plaintiff's subjective complaints, the objective clinical findings of plaintiff's physical appearance and condition after the incident that reflected upon the force that was applied by the officers while placing the plaintiff under arrest, as disclosed by St. Luke's West hospital records and X-rays on February 5, 1991, and the results of the examination conducted by Dr. Baker on February 7, 1991.
 
 
 262
 Upon the evidence developed during the trial, the closing arguments of counsel and the court's jury instructions, the jury, after due deliberations, returned a verdict absolving the defendant police officers of using excessive force while arresting and handcuffing the plaintiff, who was resisting arrest.
 
 
 263
 The jury's answers to two special interrogatories left no doubt as to its findings and conclusions:
 
 
 264
 1A. Has the plaintiff proved by a preponderance of the evidence that the following defendants used excessive force in arresting the plaintiff:
 
 
 265
 (a) Robert Heideman
 
 Yes ___
 No XX
 
 266
 (b) Robert Heckle
 
 Yes ___
 No XX
 
 267
 (c) Roger Paul
 
 Yes ___
 No XX
 
 268
 /s/
 
 Michael Connley
 Foreperson
 
 269
 * * *
 
 
 270
 2A. Has the plaintiff proved by a preponderance of the evidence that the handcuffs were excessively tight after plaintiff was in the cruiser and that defendant Roger Paul unreasonably refused to respond to a reasonable request to loosen them?
 
 Yes ___
 No XX
 
 271
 /s/
 
 Michael Connley
 Foreperson
 
 272
 (J.A. at 236-37.)
 
 
 273
 Certainly, it cannot be argued with conviction that the jury's verdict absolving the police officers of using excessive force in executing the arrest and custody of plaintiff was unsupported by competent credible evidence under any version of the testimony addressing the operative facts of the incident, especially, as here, where there was competent, credible evidence that injuries, if any suffered by the plaintiff, were not the result of any excess force, but rather proximately resulted from plaintiff's accidental fall onto the roadside berm when he backed into the roadway guardrail. Accordingly, the panel majority would be remiss if it ignored this circuit's admonition that:
 
 
 274
 A trial court may not grant a new trial on the ground of insufficient damages UNLESS THE JURY VERDICT IS ONE THAT COULD NOT REASONABLY HAVE BEEN REACHED. The remedy of a new trial for inadequate damages is appropriate only where the evidence indicates that the jury awarded damages in an amount substantially less than unquestionably proved by the plaintiff's uncontradicted and undisputed evidence. THUS, IF THE VERDICT IS SUPPORTED BY SOME COMPETENT, CREDIBLE EVIDENCE, A TRIAL COURT WILL BE DEEMED NOT TO HAVE ABUSED ITS DISCRETION IN DENYING THE MOTION.
 
 
 275
 Anchor v. O'Toole, 94 F.3d 1014, 1021 (6th Cir.1996) (citations omitted & emphases added). See also Tennant v. Peoria & P.U. Ry. Co., 321 U.S. 29, 64 S.Ct. 409, 88 L.Ed. 520 (1944):
 
 
 276
 It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.
 
 
 277
 Id. at 35, 64 S.Ct. at 412 (citations omitted); see Portage II v. Bryant Petroleum Corp., 899 F.2d 1514 (6th Cir.1990).
 
 
 278
 The panel majority, however, has vacated the jury's verdict and remanded this case for retrial by invading the discretionary judgment reserved virtually exclusively for the trial court by concluding that it erroneously:
 
 
 279
 1). bifurcated the trial of the case into causal/liability and damages stages; and
 
 
 280
 2). precluded certain relevant medical testimony during the causal/liability phase of the trial.
 
 
 281
 A review of the unabridged, admitted and excluded medical testimony proffered by the plaintiff during the causal/liability phase of the trial supports the precedential legal fidelity of the trial court's evidentiary rulings. It admitted the following broad spectrum of proof from which the jury could judge the measure of force attributable to the officers who were arresting a resisting plaintiff:
 
 
 282
 1). plaintiff's testimony describing his subjective complaints of pain to his right shoulder, arm, and right and left wrist;
 
 
 283
 2). medical records reflecting his physical examination, objective clinical observations and findings, diagnoses and treatment that resulted from his February 5, 1991, visit to the ambulatory service emergency room at St. Luke's Hospital West within hours subsequent to the incident;
 
 
 284
 3). office records of plaintiff's physical examinations and medical treatment conducted by Dr. Markesbery's associate, Dr. Baker, during his visit on February 7, 1991; and
 
 
 285
 4). Dr. Markesbery's interpretation of Dr. Baker's office records concerning his (Baker's) examination of plaintiff.[3]
 
 The trial court excluded:
 
 286
 1). the testimony of Dr. Markesbery concerning Martin's physical condition prior to the incident of February 5, 1991, which was obviously irrelevant to the issue of causation, the only issue of consideration before the jury during the first phase of the bifurcated trial;
 
 
 287
 2). Dr. Markesbery's opinion concerning the causal relationship between the surgery performed by Dr. Sommerkamp approximately one year after the incident of February 5, 1991, and the force applied by the officers in arresting a resisting Martin;
 
 
 288
 3). Dr. Markesbery's erroneous diagnosis of a possible fractured right clavicle, which was ultimately conceded by the plaintiff at trial to be erroneous; and
 
 
 289
 4). the testimony of Dr. Sommerkamp, an orthopedic surgeon to whom Martin had been referred by Dr. Markesbery approximately one year after the incident of February 5, 1991, including:
 
 
 290
 (a) his diagnosis of right posterior interosseus intraponent neuropathy (referred to as PIN--a pinched nerve similar to carpal tunnel syndrome, a degenerative condition of the nerves in the area of the arms, seen in individuals, like plaintiff, a former mechanic who performed manual labor on a routine basis);
 
 
 291
 (b) the surgery he performed on plaintiff's right arm and wrists;
 
 
 292
 (c) his follow-up treatment;
 
 
 293
 (d) his equivocal opinion as to causal relationship between his surgery and the force applied by the officers in arresting a resisting Martin approximately a year before he vacillated:
 
 
 294
 i. As we related before, we do feel that a hyperpronation/hyperextension injury to the right upper extremity COULD POTENTIALLY CAUSE posterior osseous (sic) nerve compression. However, we are UNABLE TO DEFINITIVELY STATE THAT THIS IS TRULY THE SOLE CAUSE OF SUCH A CONDITION.
 
 
 295
 ii. It is DIFFICULT TO STATE RELATIVE DEGREES OF PERCENTAGE AS FAR AS CAUSATION. Suffice to say that with the mechanism of an injury described it's CERTAINLY PLAUSIBLE, could even be considered probable that type of injury could injure the right posterior osseous nerve.iii. Any hyperextension maneuver to the upper extremities can place extreme loads on the supraspinatus rotator cuff tendons. So AGAIN, IT IS PLAUSIBLE that a prior premorbid condition of impingement, degenerative arthritis might have been aggravated from such a mechanism.
 
 
 296
 iv. I think with respect to this injury it's probably much more fair to state THAT IT'S PLAUSIBLE, NOT NECESSARILY PROBABLE, that the injury caused the aggravation or the symptoms in the right shoulder.[4]
 
 
 297
 (Appellees' Br. at 30, 31) (quoting Pl.'s Dep. Sommerkamp) (emphases added.)
 
 
 298
 The panel majority, in arriving at its conclusions, ignores the basic time-honored precedent addressing the trial court's discretionary authority to consider and rule upon the admission of evidence during the progress of a proceeding before it:
 
 
 299
 [E]videntiary rulings are left to the discretion of the trial judge. Especially in a case of this length and magnitude, the trial judge understands each item of evidence and its place in the web of other evidence in a way that no appellate court can. Realizing this, we look only for abuses of discretion. If there has been an abuse of discretion, we still will not reverse a ruling or order a new trial absent actual prejudice. THERE IS NO PREJUDICE FROM THE WRONGFUL EXCLUSION OF EVIDENCE "IF OTHER SUBSTANTIALLY EQUIVALENT EVIDENCE OF THE SAME FACTS [WAS] ADMITTED INTO EVIDENCE." Nor is there prejudice if the absence of the evidence had no effect on the final result of the trial.
 
 
 300
 In Re Air Crash Disaster, 86 F.3d 498, 526 (6th Cir.1996) (citations omitted & emphasis added).
 
 
 301
 The trial court's broad discretion to control the conduct of a trial before it was recognized in Geisler v. Folsom, 735 F.2d 991 (6th Cir.1984). In that case, this circuit concluded that:
 
 
 302
 The trial judge has, and must have, broad discretion in the conduct of a trial. Rulings on the relevancy and materiality of evidence may not be disturbed on appeal in the absence of a showing of clear abuse of discretion. We find no such abuse here. The plaintiff was permitted to introduce some evidence on each of her claims.
 
 
 303
 Id. at 997 (citation omitted).
 
 
 304
 The panel majority's disposition reflects a total misunderstanding of the distinction between the issues of causation/liability and damages as presented by the instant case.
 
 
 305
 Its rationale that the officers exceeded their constitutional authority and used excessive force to arrest a resisting plaintiff embraces not only medical testimony of his subjective complaints and objective physical consequences of the force applied that were apparent immediately subsequent to, or within a reasonable time after the occurrence of the incident, i.e. fractures, open wounds, bleeding, abrasions, contusions, swelling, discoloration, etc., but also the secondary effects of the objective manifestations of the force applied and resultant injuries, if any, such as, in the instant case, psychological trauma, physical degenerative changes which appeared long after the event in controversy, is misguided.
 
 
 306
 The implication of the majority opinion that Dr. Markesbery's testimony was curtailed during the causal/liability phase of the trial is contradicted by the record. The trial judge permitted him to testify to all aspects of his relevant, knowledgeable involvement with Martin after the incident. The trial judge only excluded Markesbery's inadmissible testimony concerning plaintiff's physical condition before his confrontation with the police officers, his (Markesbery's) incorrect diagnosis of a fractured right clavicle (conceded by plaintiff during trial), and his equally inadmissible opinion evaluating surgery performed by Dr. Sommerkamp a year or more after the incident involving the defendant police officers and his inadmissible attenuated opinion concerning the causal relationship between the surgery and the force applied by the officers while arresting a resisting plaintiff.
 
 
 307
 Dr. Sommerkamp's testimony concerning his surgery and his already discussed equivocal opinion concerning a causal relationship between the force applied by the officers in arresting the plaintiff more than a year earlier and the necessity for his surgery was properly excluded by the trial judge as irrelevant to the issue of causation and more appropriate to the issue of damage, if any, suffered by Martin. KMC Co. v. Irving Trust Co., 757 F.2d 752 (6th Cir.1985).
 
 
 308
 In reviewing assertions of error pertaining to the admission of expert evidence, we start with the principle that "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous."
 
 
 309
 Id. at 763 (emphases added).
 
 
 310
 The testimony of two psychologists (without objection by plaintiff), one of whom was Martin's son-in-law, concerning their professional treatment of Martin, which commenced more than a year after the incident giving rise to this litigation, was totally irrelevant to the issue of causation and properly excluded by the trial judge and is not worthy of further comment.
 
 
 311
 The majority's ill-conceived resolution of the trial judge's rulings, excluding limited medical evidence, again ignores existing Sixth Circuit precedent and invades the virtually impregnable discretionary authority of a trial judge.
 
 
 312
 This circuit, and every other circuit, has recognized that:
 
 
 313
 The trial judge has, and must have, broad discretion in the conduct of a trial. Rulings on the relevancy and materiality of evidence may not be disturbed on appeal in the absence of a showing of CLEAR ABUSE OF DISCRETION. We find no such abuse here. The plaintiff was permitted to introduce some evidence on each of her claims.
 
 
 314
 Geisler v. Folsom, 735 F.2d 991, 997 (6th Cir.1984) (citation omitted & emphasis added).
 
 
 315
 See also In re Air Crash Disaster, 86 F.3d 498 (6th Cir.1996):
 
 
 316
 We note at the outset that evidentiary rulings are left to the discretion of the trial judge. Especially in a case of this length and magnitude, the trial judge understands each item of evidence and its place in the web of other evidence in a way that no appellate court can. Realizing this, we look only for abuses of discretion. If THERE HAS BEEN AN ABUSE OF DISCRETION, we STILL WILL NOT REVERSE A RULING or order a new trial ABSENT ACTUAL PREJUDICE. There is no prejudice from the wrongful exclusion of evidence "if other substantially equivalent evidence of the same facts [was] admitted into evidence [as in the instant case]." Nor is there prejudice if the absence of the evidence had no effect on the final result of the trial.
 
 
 317
 * * * * * *
 
 
 318
 [A] court is free to exclude any expert testimony, including the testimony of an announced expert, IF THE TESTIMONY IS CUMULATIVE OR REDUNDANT UNDER FED.R.EVID. 403. ... Northwest put twenty-four expert witnesses on the stand. The testimony of these experts, taken as a whole, covers every part of the testimony of Kennedy, Rimson, and Maser. As the court said in Kendra [Oil & Gas, Inc. v. Homco, Ltd., 879 F.2d 240, 243 (7th Cir.1989) ]: nothing "suggests that [the expert] would have added to these interpretations a new angle or argument, as opposed to the refrain 'me too'." For these reasons, the district court did not abuse its discretion by denying Northwest's motion to re-introduce the stricken opinions.
 
 
 319
 Id. at 526-27 (citations omitted & emphases added) (first & fifth alterations in original).
 
 
 320
 During the course of the trial, the plaintiff presented innumerable witnesses in addition to the adversary parties themselves, who testified to subjective and objective indicia of the force that was applied by the officers in arresting a resisting plaintiff. The testimony of these witnesses was supplemented by extensive hospital emergency room records, including plaintiff's prolific subjective complaints during his emergency room examination on February 5, 1991, and Dr. Baker's examination on February 7, 1991. Through objective visual indications of the force to which plaintiff was subjected to during the course of his arrest, together with the results of a physical examination and its resultant clinical findings and X-rays, plaintiff also introduced Dr. Baker's conclusions regarding plaintiff's physical examination, and Dr. Markesbery's medical evaluation of plaintiff's subjective complaints and the objective medical evidence reflecting upon the issue of force exerted by the officers during the arrest. The witnesses and medical records were examined and cross-examined ad nauseum before the jury. This cumulative evidence more than exhausted the issue bearing upon the degree of force attributed to plaintiff's arrest. The complained of excluded medical evidence, if relevant at all, was redundant and would have added nothing new for the jury's consideration of excessive force. Consequently, the trial court did not abuse its discretion in denying its introduction. In Hines v. Joy Mfg. Co., 850 F.2d 1146 (6th Cir.1988), the court stated:
 
 
 321
 Appellant must show substantial prejudice before we will grant a new trial based on an alleged Rule 26(e) error. In the instant case, the district court struck only those portions of Mr. Lebo's testimony that did not conform to his deposition testimony, i.e., that there was no lockout device to deactivate the continuous miner while still allowing the bridge units to be operated for clean out and that there was no pull-cord device to grab in an emergency. Appellant argues that since the substance of the bulk of the excluded testimony was furnished by other witnesses, admission of this testimony would not have prejudiced Long-Airdox unfairly. This argument, however, convinces the court that because the substance of the excluded testimony was furnished by other witnesses for appellant, its exclusion was not prejudicial to appellant. For this reason, we reject appellant's argument.
 
 
 322
 Id. at 1153 (citation omitted & emphases added).
 
 
 323
 Evidentiary rulings of a trial court are reviewed for an abuse of discretion. Hamling v. United States, 418 U.S. 87, 124-25, 94 S.Ct. 2887, 2911-12, 41 L.Ed.2d 590 (1974). This circuit has determined that:
 
 
 324
 An abuse of discretion exists when the reviewing court is firmly convinced that a mistake has been made. " 'A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses an erroneous legal standard.' "
 
 
 325
 Romstadt v. Allstate Ins. Co., 59 F.3d 608, 615 (6th Cir.1995) (citations omitted); see In re Bendectin Litigation, 857 F.2d 290, 307 (6th Cir.1988) cert. denied, 488 U.S. 1006, 109 S.Ct. 788, 102 L.Ed.2d 779 (1989).
 
 
 326
 The Supreme Court explains the "clearly erroneous" standard of review as alluded to in Romstadt, in the following commentary:
 
 
 327
 Although the meaning of the phrase "clearly erroneous" is not immediately apparent, certain general principles governing the exercise of the appellate court's power to overturn findings of a district court may be derived from our cases. The foremost of these principles ... is that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." THIS STANDARD PLAINLY DOES NOT ENTITLE A REVIEWING COURT TO REVERSE THE FINDING OF THE TRIER OF FACT SIMPLY BECAUSE IT IS CONVINCED THAT IT WOULD HAVE DECIDED THE CASE DIFFERENTLY. THE REVIEWING COURT OVERSTEPS THE BOUNDS OF ITS DUTY UNDER RULE 52(A) IF IT UNDERTAKES TO DUPLICATE THE ROLE OF THE LOWER COURT. "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 328
 Anderson v. Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citations omitted & emphases added).
 
 
 329
 The factual and legal pedagogy of the instant case demonstrates the panel majority's disdain for long-standing precedential decisions of the Supreme Court and of this circuit addressing basic legal concepts. A comprehensive review of this trial record factually and legally supports the trial judge's considered evidentiary rulings which are totally devoid of discretionary abuses.
 
 
 330
 Moreover, pursuant to Sixth Circuit existing precedent, which again was ignored by the panel majority, the admission of relevant, potentially prejudicial evidence is also placed within the sound discretion of the trial court.
 
 
 331
 Ignoring the guidance of In re Beverly Hills Fire Litigation, 695 F.2d 207 (6th Cir.1982), the majority opinion erroneously posits that the trial court's severance of the issue of causation liability from the damage phase of the trial, if not itself error, nonetheless resulted in the improper exclusion of medical evidence relevant to the issue of causation/liability. In response to an identical charge of error, the reviewing court in Beverly Hills decided that:
 
 
 332
 Evidence is not admissible in all cases where it is relevant. Fed.R.Evid. 403 provides:
 
 
 333
 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 
 
 334
 Under this rule, admission of such evidence is placed within the sound discretion of the trial court.
 
 
 335
 Id. at 218.
 
 
 336
 This legal precedent is not foreign to this panel majority, as evidenced in Cox v. Treadway, 75 F.3d 230 (6th Cir.1996), decided about one year ago, wherein the author of Treadway, who is a member of the instant panel, wrote:
 
 
 337
 Appellate courts review evidentiary rulings on the relevance and materiality of evidence for abuse of discretion. THE DISTRICT COURT'S EXCLUSION OF THIS EVIDENCE WAS AN ABUSE OF DISCRETION. The evidence was plainly relevant to the officers' ability to perceive and to the officers' tendency to overreact to the events of the evening. NONETHELESS, THE DISTRICT COURT'S ERROR ON THIS ISSUE WAS NOT REVERSIBLE ERROR BECAUSE THE EXCLUDED TESTIMONY WAS UNLIKELY TO HAVE A SIGNIFICANT EFFECT ON THE OUTCOME OF THE TRIAL.
 
 
 338
 Id. at 241 (citation omitted & emphases added).
 
 
 339
 See also Leonard v. Uniroyal Inc., 765 F.2d 560 (6th Cir.1985):
 
 
 340
 Any prejudice that Uniroyal may have suffered was insufficient to warrant overturning the jury's verdict. "With respect to the erroneous exclusion of evidence in a jury trial, it has often been held that the exclusion is not prejudicial IF OTHER SUBSTANTIALLY EQUIVALENT EVIDENCE OF THE SAME FACTS HAS OTHERWISE BEEN ADMITTED INTO EVIDENCE " [as in the instant action]. "No error in the admission or exclusion of evidence is ground for reversal unless refusal to take such action appears to the Court to be inconsistent with substantial justice."
 
 
 341
 Id. at 567 (footnote & citations omitted) (emphasis added).
 
 
 342
 The majority has identified no prejudice that resulted from the trial judge's evidentiary rulings in this proceeding.
 
 
 343
 Although the parties have waived assigning error to the trial judge's order bifurcating the issue of liability from damages, the majority has nevertheless seen fit to again sua sponte invade another sanctum of a trial court's discretionary authority and erroneously fault the trial judge's decision to limit the first phase of the trial to the issue of causation/liability of the defendant officers. Ostensibly, the majority's objection to the trial court's order of bifurcation is anchored in its equally erroneous conclusion that the trial court abused its discretion, as hereinbefore discussed, by excluding certain medical testimony which limited plaintiff from more fully demonstrating the degree of force applied by the defendant police officers while placing him into custody.
 
 
 344
 Again, bifurcation is a basic legal concept. Without delving into its historical evolution, suffice to recall this circuit's pronouncement:
 
 
 345
 It is well settled that the ordering of separate trials is within the sound discretion of the trial judge. Plaintiffs argue, however, that no case law supports severance of the issue of causation; rather, only severance of liability and damages has been allowed. This view-point is inconsistent with the language of Fed.R.Civ.P. 42(b), which provides in part:
 
 
 346
 Separate Trials. The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial ... of any separate issue....
 
 
 347
 Beverly Hills, 695 F.2d at 216 (citations omitted) (alterations and emphasis in original).
 
 
 348
 Bifurcation of this trial on the issues of cause/liability and damages did not operate as reversible error nor was it prejudicial to appellant in presenting his case as to the actions of the officers. Appellant's argument that the extent of the injuries is probative of the force applied by the officers has been considered and rejected by other courts. In Kisteneff v. Tiernan, 514 F.2d 896 (1st Cir.1975), an assault and battery case, the plaintiff argued, as in the instant case, that the trial court had committed reversible error in bifurcating the issues of damages and liability, because the medical evidence was probative as to the severity of the blow which he had received. The First Circuit Court of Appeals, however, noted that the medical evidence was only minimally relevant to the issue as to the severity of the blow received, and that bifurcation of these two issues (liability and damages) did not constitute reversible error. Id. at 897. The SEVERITY OF THE BLOW COULD BE ESTABLISHED, as in the instant case, by OTHER EVIDENTIARY AVENUES, SUCH AS THE TESTIMONIES OF THE PLAINTIFF, AND OTHER WITNESSES. Id.
 
 
 349
 In Davis v. Freels, 583 F.2d 337 (7th Cir.1978), the Seventh Circuit Court of Appeals refused to rule that the trial court's decision to bifurcate an excessive use of force case based upon the issues of damages and liability constituted reversible error. Id. at 343. In Davis, as in the case at bar, the plaintiff argued that the trial court abused its discretion in bifurcating the issues of liability and damages in an excessive use of force, because these issues allegedly overlap. Id. The Seventh Circuit Court of Appeals, however, rejected that argument, and instead held that the decision to separate the issues of liability and damages in a civil case is reserved to the discretion of the trial court. Id.
 
 
 350
 Because the trial judge committed no discretionary abuses in ruling upon the admissibility of limited medical evidence proffered by the plaintiff Martin during the causal/liability phase of the trial before him because his bifurcation of the issues of cause/liability and damages was within his discretion and in accordance with existing legal precedent, and because the panel majority has failed to identify any prejudice to the plaintiff as a result of that order, I would AFFIRM the trial court's rulings in their entirety.
 
 
 351
 If this appellate review considers the panel majority's disposition of Officer Paul's motion seeking qualified immunity within the context of existing Sixth Circuit and national judicial precedent, the disposition is egregiously erroneous.
 
 
 352
 Initially, the standard against which entitlement to qualified immunity is judged was enunciated in Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), wherein the Supreme Court stated that:
 
 
 353
 [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
 
 
 354
 Id. at 818, 102 S.Ct. at 2738.
 
 
 355
 Five years later, in Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), the Court directed:
 
 
 356
 The contours of the right must be sufficiently clear that reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, ... but it is to say that in the light of pre-existing law the unlawfulness must be apparent.
 
 
 357
 Id. at 640, 107 S.Ct. at 3039.
 
 
 358
 Although Anderson does not require that the specific action in controversy (tight handcuffing) has been held unlawful, the burden rests upon the plaintiff to prove by a preponderance of the evidence that the questionable conduct was "apparent" in light of pre-existing law. If the plaintiff fails to carry the assigned burden of proving that the defendant violated a clearly established constitutional right, the court must prevent the plaintiff from subjecting the defendant to trial:
 
 
 359
 [qualified immunity is an] entitlement not to stand trial or face the burdens of litigation.... The entitlement is an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.
 
 
 360
 Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis added).
 
 
 361
 Caldwell v. Moore, 968 F.2d 595 (6th Cir.1992), directs district courts as well as post Caldwell panels of this circuit that:
 
 
 362
 To determine whether a right is clearly established, a court may rely on decisions of the United States Supreme Court, the courts of its own circuit, the highest state court in which it sits, and under very limited circumstances, the courts from other federal circuits.
 
 
 363
 Id. at 599; see Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); Malley v. Briggs, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).
 
 
 364
 In addressing the issue of whether a certain action violates "clearly established" law, this circuit adopted the following precedential standard in Ohio Civil Serv. Employees Ass'n v. Seiter, 858 F.2d 1171 (6th Cir.1988):
 
 
 365
 In the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its Court of Appeals, or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law" these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be SO CLEARLY FORESHADOWED BY APPLICABLE DIRECT AUTHORITY AS TO LEAVE NO DOUBT IN THE MIND OF A REASONABLE OFFICER THAT HIS CONDUCT, IF CHALLENGED ON CONSTITUTIONAL GROUNDS, WOULD BE FOUND WANTING.
 
 
 366
 Id. at 1177 (emphasis added).
 
 
 367
 Prior to granting Officer Paul's Motion for Qualified Immunity with respect to the handcuffs, the trial court, unlike the panel majority,[5] conscientiously and thoroughly first determined that there were no decisions issued by either the Supreme Court, nor this circuit court of appeals, which addressed the use of tight handcuffs as a basis for liability under 41 U.S.C. § 1983. The trial court then conducted a scrutinizing evaluation of other circuit court decisions and the decisions of the district courts throughout the circuits, and concluded that the law in this area was far from being "clearly established."
 
 
 368
 THE COURT: Okay. The authorities I found--First of all, the test for qualified immunity is[,] is the right clearly established, and the specific right and specific thing the officer did, was it clear to the officer--should have been, using an objective standard[,] clear to the officer there in the field, that in the Sixth Circuit he would be violating the constitutional rights by applying the handcuffs too tight; and I find, on the basis of my research, the law in the Sixth Circuit is not clear and the law in the other circuits is divided.
 
 
 369
 (Tr. at 581-82.)
 
 
 370
 The only reported case which the majority opinion relies upon for justifying its denial of qualified immunity to Officer Paul is Walton v. City of Southfield, 995 F.2d 1331 (6th Cir.1993), a decision in which I participated. Regrettably, the majority totally misconceived the law of that case. Apart from being decided two years and four months after February 5, 1991, the date on which Officer Paul purportedly applied the handcuffs to plaintiffs wrists, the decision in Walton directed that "if genuine ISSUES OF MATERIAL FACT EXISTED as to whether the defendants actually did commit acts that would violate a clearly established right, then summary judgment on qualified immunity was improper."
 
 
 371
 The reviewing court in Walton affirmed the trial court's denial of summary judgment to the officer based on qualified immunity because:
 
 
 372
 In this case, the facts are disputed as to WHETHER BIRBERICK KNEW THAT WALTON HAD AN INJURED SHOULDER. Walton's version of the facts is that she begged not to be handcuffed because of her injured shoulder. In contrast, Birberick states that Walton never told him why she did not want to be handcuffed, and only told him her shoulder was hurting when they were travelling to the station. Although the right to be free from excessive use of force is clearly established, there is a genuine issue of material fact here as to whether the officer in fact used excessive force. Therefore, we affirm the district court's denial of qualified immunity on this issue.
 
 
 373
 Id. at 1342 (emphasis added).
 
 
 374
 In Walton, the appellate review never considered if handcuffing constituted the use of excessive force in violation of a constitutional prohibition. It stopped short of addressing that issue. It reasoned that disposition of that substantive question depended upon a preliminary factual resolution of the arresting officer's knowledge of the poor physical condition of the plaintiff's shoulder. The instant case presented no preliminary factual scenario that required resolution. Consequently, Walton is inapplicable.
 
 
 375
 It should also be noted, that although Officer Paul, in his individual capacity, was granted qualified immunity by the trial judge with respect to the § 1983 claims on his alleged failure to loosen the handcuffs, the jury was, nevertheless, presented an interrogatory which specifically addressed that issue. Because Martin had brought a claim against Officer Paul's employer, City of Walton, under the theory of respondeat superior on the state law tort of assault and battery, the trial court requested the jury to address the reasonableness of Officer Paul's actions allowing the handcuffs to remain on Martin until he was secured in the jail in a special interrogatory:
 
 
 376
 2A. Has the plaintiff proved by a preponderance of the evidence that the handcuffs were excessively tight after plaintiff was in the cruiser and that defendant Roger Paul unreasonably refused to respond to a reasonable request to loosen them?
 
 Yes ___
 
 377
 No XX/s/
 
 Michael Connley
 Foreperson
 
 378
 Assuming arguendo that the language of Walton is interpreted as the majority opinion suggests, which interpretation is erroneous, its pronouncements had no legal effect or precedential significance which clearly established the law, particularly in this circuit, that the placing of tight handcuffs constitutes constitutionally prohibited excessive force. Nor did the decision receive public notoriety that would have placed Officer Paul on notice, or should have placed him on notice of the constitutional impingement, for the obvious reason that Walton was not decided or published until June 10, 1993, some two years and four months after Officer Paul handcuffed Martin on February 5 of 1991.
 
 
 379
 In the instant case, the majority opinion reverses the trial court's grant of qualified immunity to Officer Paul with the following convoluted obfuscation:
 
 
 380
 This circuit, however, has chosen to view an "exceedingly forceful handcuffing" claim under the general excessive force rubric. In Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir.1993), we denied qualified immunity to an officer who handcuffed a woman with a shoulder injury. Although Walton was decided in 1993, the incident occurred in 1988, ... we confidently denied qualified immunity [in 1993] because the case presented a genuine issue of fact regarding whether excessive force was used. Because clearly established law in 1991, the time of the incident in this case, prohibited an officer's use of excessive force, and because a genuine issue of material fact exists as to whether Officer Paul used excessive force under the circumstances, the district court erred by granting Paul qualified immunity on the handcuffing issue.
 
 
 381
 This explanation of retroactivity is incomprehensible and defies meaning. If Walton was decided in 1993, any precedential value that may have attached to its disposition was unknown to the world, including Officer Paul in 1991, and could not have impacted his knowledge on February 5, 1991, the date on which he arrested plaintiff Martin.
 
 
 382
 Initially, the panel majority exercises judicial license when it incorrectly concludes that Walton denied qualified immunity to an officer who handcuffed a woman with a shoulder injury. Although the officer in that case was denied qualified immunity on summary judgment, he was not denied qualified immunity because the court had concluded that he placed the handcuffs on too tightly and impinged a constitutional prohibition. As already discussed, that issue was not reached or decided in the reviewing court's disposition. Consequently, the majority opinion's surmise is incorrect and Walton lends no support to the majority's opinion that, in this circuit, the law was clearly established that the placing of handcuffs too tightly constituted a constitutional violation on February 5, 1991.
 
 
 383
 Secondly, there were no outstanding issues of disputed material fact as to whether Officer Paul used excessive force in handcuffing the plaintiff, especially in the absence of apparent injury to the plaintiff's wrists. That issue, along with all issues concerning the use of excessive force during the detention of plaintiff and thereafter, was resolved by the jury in favor of Officer Paul as evidenced by its answer to the special interrogatories submitted by the court at the conclusion of the evidentiary trial.
 
 
 384
 Lastly, the plaintiff failed to carry his heavy burden and prove by a preponderance of the evidence that Officer Paul was not entitled to the protection of qualified immunity.
 
 
 385
 Because of the superficial transitory injuries to Martin's wrists from the handcuffs, coupled with the absence of clearly established law within this circuit and the existing conflict of opinion between other circuits that have addressed the issue of tight handcuffing as an excessive force prohibition constitutional impingement, I would AFFIRM the trial court's grant of qualified immunity to Officer Paul and, accordingly, enter my respectful DISSENT to the panel disposition of the issue.
 
 
 386
 For the reasons stated herein, I would also respectfully DISSENT from the majority's resolution of all other issues presented by this appeal and AFFIRM the jury's verdict and all discretionary evidentiary and other rulings of the trial court.
 
 
 387
 FN* Judge Krupansky would grant rehearing for the reasons stated in his dissent.
 
 
 
 [1]
 The duration of the scuffle was described by the plaintiff as occurring within a time frame of "20 to 30 seconds;" by his co-conspirator Serra as "30 seconds;" by Officer Heideman as "a few seconds to ten seconds;" and by Officer Heckle as "5 to 10 seconds."
 
 
 [2]
 There is a question as to the occurrence of any previous accident beyond the self-serving declarations of the plaintiff and his long-time friend and accomplice, Serra
 
 
 [3]
 The trial judge also admitted the testimony of Martin's co-conspirator, Thomas Michael Serra, and his girlfriend, Peggy Carroll, who were permitted to describe his abrasions, scrapes, scratches, and contusions immediately following the incident of February 5, which objective manifestations could be probative of the issue of excessive force
 
 
 [4]
 Neither Dr. Markesbery nor Dr. Sommerkamp would express an opinion based upon reasonable medical probability that the plaintiff's degenerative nerve syndrome was proximately caused by the incident of February 5, 1991
 
 
 [5]
 To support its circuitous reasoning for denying qualified immunity, the majority opinion cites two unpublished per curiam decisions of this circuit in Grooms v. Dockter, 1996 WL 26917, 76 F.3d 378 (6th Cir.1996) (per curiam) (qualified immunity denied) and Elrich v. Wright, 1987 WL 44485, 829 F.2d 38 (6th Cir.1987) (per curiam) (bruising caused by tight handcuffs, qualified immunity upheld), cert. denied, 484 U.S. 1030, 108 S.Ct. 761, 98 L.Ed.2d 772 (1988). Apart from having no precedential value within this circuit, it is hardly expected that a legally unsophisticated police officer would have reason to even suspect that the decisions existed when, in many instances, such unpublished per curiam opinions are either ignored by or beyond the knowledge of attorneys practicing before the bar. Moreover, the conflicting dispositions demonstrate that there was no "clearly established law" within this circuit that "SO CLEARLY FORESHADOWED BY APPLICABLE DIRECT AUTHORITY AS TO LEAVE NO DOUBT IN THE MIND OF A REASONABLE OFFICER THAT HIS CONDUCT, IF CHALLENGED ON CONSTITUTIONAL GROUNDS, WOULD BE FOUND WANTING." Ohio Civil Serv. Employees Ass'n, 858 F.2d at 1177 (emphasis added)